Gary L. Kaplan
Peter B. Siroka
FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
One New York Plaza
New York, New York  10004
Telephone: (212) 859-8000
Facsimile:  (212) 859-4000

*Attorneys for Lic. Fernando del Castillo Elorza as
Foreign Representative of Controladora
Comercial Mexicana, S.A.B. de C.V.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 15 |
| | : | |
| **CONTROLADORA COMERCIAL** | : | Case No. 10-13750 (SMB) |
| **MEXICANA, S.A.B. de C.V.** | : | |
| | : | |
| Debtor in a Foreign Proceeding. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR RELATED RELIEF

Lic. Fernando del Castillo Elorza (the "Petitioner") as the authorized foreign representative of Controladora Comercial Mexicana, S.A.B. de C.V. ("CCM"), a debtor in a voluntary insolvency proceeding currently pending in Mexico (the "Concurso Proceeding"), by and through its undersigned counsel, Fried, Frank, Harris, Shriver & Jacobson LLP, respectfully submits this verified petition (the "Chapter 15 Petition") seeking entry of an order (i) recognizing the Concurso Proceeding as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), (ii) recognizing Fernando del Castillo Elorza as the foreign representative of CCM in connection with the Concurso Proceeding and (iii) granting related relief pursuant to section 1520 of the

Bankruptcy Code. In support of the Chapter 15 Petition, Petitioner has filed the declaration of the Petitioner in support of the Chapter 15 Petition (the "Foreign Representative Declaration") and the declaration of Fernando del Castillo, as Mexican Counsel to CCM, in support of the Chapter 15 Petition (the "del Castillo Declaration").[1]

## BACKGROUND

### A.    CCM's Business

1.    Originally founded in 1944, CCM is the holding company for a series of Mexican businesses that comprise the third largest operator of food retail stores in Mexico. As of December 31, 2009, CCM's businesses operated 231 retail stores and 73 restaurants under eight different formats—six different retail store formats, one warehouse club and one chain of family restaurants—in twenty-four Mexican states. CCM's retail brands include Comercial Mexicana, Bodega Comercial Mexicana, Mega, City Market, Sumesa, Fresko and Al Precio. CCM also owns the Restaurantes California chain of family-style restaurants and participates in a joint-venture with Costco Wholesale Corporation to operate warehouse clubs under the Costco brand. For the fourth quarter of 2009, CCM reported net sales of approximately MXP$ 14.441 billion (approximately US$1.139 billion) and employed approximately 33,000 people.[2]

### B.    CCM's Indebtedness and the Circumstances Precipitating the Concurso Proceeding

i.    *CCM's Current Indebtedness*

2.    CCM's principal indebtedness consists of (i) unsecured notes, (ii) Mexican commercial paper (the "Cebures") and (iii) unsecured bank loans (the "Bank Debt"). There are three series of unsecured notes: (a) US$200 million in principal of 6.625% Senior Notes due 2015 (the "2015 Notes"); (b) MXP$ 3 billion in principal of 8.7% Senior Notes due 2027 (the

---

[1]    The Foreign Representative Declaration and del Castillo Declaration are incorporated herein by reference.
[2]    As a holding company, CCM has no employees of its own. All employees are employees of CCM's subsidiaries and affiliates.

"2027 Notes"), and (c) MXP$ 111,341,051 in principal of UDI-denominated 8% Senior Notes due 2010[3] (the "2010 Notes" together with the 2015 Notes and 2027 Notes, the "Notes").  The Notes are held by Cede & Co., but are beneficially held by many different parties (the "Noteholders"); and as such, not all Noteholders are known to CCM.  The Cebures consist of MXP$ 1.5 billion of commercial paper, 97.3% of which is held by a subsidiary of CCM, Tiendas Comercial Mexicana ("Tiendas"), which acquired the Cebures in an exchange offer on May 4, 2010.  The remaining Cebures are held by a number of different owners who did not participate in the exchange offer.  The Bank Debt consists of MXP and USD denominated unsecured loans to seven different Mexican banks (the "Commercial Banks") totaling MXP$ 2.545 billion and US$99.4 million.[4]  CCM has also entered into a Settlement and Debt Acknowledgement Agreement (as defined below) to settle CCM's obligations under certain foreign exchange and interest rate Derivative Transactions (as defined below), as more fully described below.

    ii.    *The Derivative Transactions*

    3.    CCM began engaging in hedging activities in the 1990s, to control currency risk on U.S. imports and debt service.  From time to time, CCM also entered into interest rate swaps to convert long term fixed rate payments into cheaper floating rate payments, to save on debt service costs.

    4.    In 2005, CCM entered into a substantial program of forward dollar purchases to hedge against the potential decline in value of the Mexican peso (the "Peso Hedges").  When the Mexican peso did not decline, CCM began to lose money on the Peso Hedges.  Subsequently, CCM entered into various derivative transactions to offset the losses from the Peso Hedges.

---

[3]    The MXP value of the 2010 Notes is based on the UDI conversion rate as of April 28, 2010.  The 2010 Notes are 24,981,400 UDI in principal.

[4]    A list of the Commercial Banks and their respective holdings of the Bank Debt is included on Schedule 3 to the Term Sheet (defined below).

Many of these transactions involved CCM taking positions in the U.S. dollar and other foreign currencies.

5.      During 2007 and 2008, CCM entered into derivative transactions (the "Derivative Transactions") with JP Morgan Chase Bank, N.A., Banco Nacional de Mexico, SA Institution de Banca Multiple, Grupo Financiero Banamex, Banco Santander, S.A, Grupo Financiero Santander, Barclays Bank PLC, J. Aron & Company,[5] Merrill Lynch Capital Services Inc. and Merrill Lynch Capital Markets AG (together, the "Derivative Counterparties").

6.      In late September and early October 2008, following turmoil in the financial markets and the Lehman Brothers bankruptcy filing, there was a significant devaluation of the Mexican peso and the Euro against the U.S. dollar.  As a result of this devaluation, CCM found itself facing substantial claims for margin calls arising on account of the Derivative Transactions. In early October, the Derivative Counterparties exercised contractual provisions to terminate the transactions, and asserted claims exceeding US $2 billion against CCM for the amounts they claim are due upon such early termination.

7.      Because of the mounting loss claims and additional margin calls associated with the Derivative Transactions, CCM faced a severe liquidity crisis and became unable to pay its suppliers and providers.  All payments to suppliers and providers temporarily ceased on October 7, 2008, the same day that CCM made its final margin call payment to the Derivative Counterparties.  On October 9, 2008, CCM filed a voluntary petition (the "First Concurso Petition") to commence a case under Mexico's *Ley de Concursos Mercantiles* (the "Concurso Law") with the District Court for Civil Matters for the Federal District, Mexico (the "Federal District Court"), which was subsequently rejected on October 27, 2008.  On October 29, 2008,

---

[5]      On October 20, 2008, J. Aron & Company was assigned the claims in the Derivative Transactions.  For ease of reference, both J. Aron & Company and J. Aron & Company's assignor are referred to herein as "J. Aron & Company."

CCM filed a second petition for relief under the Concurso Law with the Federal District Court (the "Second Concurso Petition"). The Second Concurso Petition was rejected on November 3, 2008. Both the First Concurso Petition and the Second Concurso Petition were denied on technical grounds under Mexican law.

iii.     *Current Litigation*

8.      On November 6, 2008, certain of the Derivative Counterparties (the "DCP Plaintiffs")[6] filed complaints against CCM in the New York State Supreme Court for New York County (the "New York Court"), which are currently pending before Justice Eileen Bransten (the "Derivatives Litigation").[7] Generally, the complaints allege that CCM breached the underlying agreements governing the Derivative Transactions by failing to post required collateral or make payments allegedly owed to the DCP Plaintiffs. The DCP Plaintiffs are seeking combined damages of over USD $1.5 billion. Each of the DCP Plaintiffs moved for summary judgment in the Derivatives Litigation (such motions, the "Summary Judgment Motions"). On March 16, 2010, the New York Court issued its decisions granting the Summary Judgment Motions as to liability only, and referring the quantification of losses to a special referee to hear and report. CCM has appealed those decisions. At a conference held on May 12, 2010, the New York Court invited CCM to file motions setting forth its grounds for seeking pretrial discovery on loss calculations. Such motions are scheduled to be filed on July 21, 2010, and to be argued, after briefing, on October 28, 2010.

---

[6]     The DCP Plaintiffs are JP Morgan Chase Bank, N.A., Barclays Bank PLC, J. Aron & Company, Merrill Lynch Capital Services Inc. and Merrill Lynch Capital Markets AG.

[7]     The case names and their index numbers are: J.P. Morgan Chase Bank, N.A. v. CCM, Index Number 603215/2008; J. Aron & Company v. CCM, Index No. 603225/2008; Merrill Lynch Capital Markets AG and Merrill Lynch Capital Services Inc. v. CCM, Index No. 603214/2008; and Barclays Bank PLC v. CCM, Index No. 603233/2008.

iv.    *Current Restructuring*

9.    Following the rejection of the Second Concurso Petition and shortly after the commencement of litigation by the DCP Plaintiffs, CCM commenced the process of negotiating a global settlement of its outstanding indebtedness with its various creditor constituencies.  After more than a year of negotiations, in late May 2010, CCM agreed with the Derivative Counterparties, the Commercial Banks and certain Noteholders (the "Ad Hoc Group of Noteholders") on the terms of a restructuring to be consummated through a prenegotiated plan of reorganization under the Concurso Law that is supported by over 85% of the eligible debt and claims of CCM (as further described in the Term Sheet (defined below), the "Eligible Debt").

**C.    The Concurso Plan**

10.    On July 14, 2010, CCM commenced the Concurso Proceeding by filing a voluntary petition for relief under the Concurso Law (the "Concurso Petition") in the Federal District Court, along with a prenegotiated concurso plan of reorganization (the "Concurso Plan"). As of the date hereof, the Concurso Plan is supported by a sufficient majority so as to bind non-consenting parties under Mexican Law.

11.    The Concurso Plan, as more fully described in the term sheet setting forth the terms of the Concurso Plan, which is attached hereto as **Exhibit 1** (the "Term Sheet") (defined below), provides that in exchange for extinguishment of their existing claims, (i) the Derivative Counterparties will receive their pro rata share of a financial package consisting of (a) a new term loan facility (the "New Term Loan"), (b) a new asset-linked debt facility (the "Asset-Linked Facility"), and (c) new secured bonds (the "New Bonds"); (ii) the Commercial Banks will receive their pro rata share of a financial package consisting of portions of the New Term Loan and Asset-Linked Facility; and (iii) the Noteholders will receive a portion of the New Bonds.

12.     The New Term Loan consists of two tranches: an MXP$ 5.25477 billion amortizing tranche and an MXP$ 3.40773 billion bullet tranche.  The New Term Loan is secured by, among other things (a) first-priority liens on (i) all of CCM's real property assets with a value in excess of MXP$ 50 million (with certain specific exceptions), (ii) all of the capital stock owned by CCM, directly or indirectly, in each of the Guarantors[8] (other than capital stock currently serving as collateral for the Scheduled Working Capital Debt Facilities (to be defined in the definitive documentation) and Credit Support Facilities (to be defined in the definitive documentation)), (iii) all collateral previously pledged for the Scheduled Working Capital Debt Facilities and Credit Support Facilities that ceases to secure such facilities (each as defined in the Term Sheet), and (iv) a Creditor Proceeds Account (as defined in the Term Sheet); and (b) the Comerci Proceeds Account (as defined in the Term Sheet) and any funds or securities therein, to the extent held for reinvestment in connection with an asset sale or casualty event.  The Asset-Linked Facility will consist of two tranches of (i) MXP$ 4.15074 billion and (ii) MXP$ 1.61593 million minus the amount of any cash proceeds paid by CCM to the Tranche A2 (as defined in the Term Sheet) creditors on the Closing Date[9] from Additional Tranche A2 Collateral Sales (as defined in the Term Sheet) made before the Closing Date, respectively.  The two tranches of the Asset-Linked Facility are secured by separate pools of collateral, and proceeds from the sale of such collateral will be used to pay down the balance of the respective tranche, and if the proceeds exceed the remaining balance of such tranche the excess must be used to pay the other tranche (60% of any excess remaining after payment of the other tranche of the Asset-Linked Facility

---

[8]     Guarantors are defined in the Term Sheet to include "all existing direct and indirect subsidiaries of Comerci and all future direct or indirect subsidiaries of [CCM], except for (i) Costco and its Subsidiaries and (ii) each existing and future permitted joint venture, so long as [CCM's] ownership of such joint venture is 50% or less and [CCM] does not otherwise control such joint venture."

[9]     The "Closing Date" is the date that is three (3) days following the date on which there is a final and non-appealable judgment issued by the Mexican court with respect to the Concurso Plan.

will be used to prepay the New Term Loan and the New Bonds, and the remaining 40% of such

excess may be used by CCM for certain enumerated purposes set forth in the Term Sheet). The

New Bonds will consist of a series of Mexican bonds and U.S. Dollar bonds in the amount of

MXP$ 1.95143 billion and US$223.9 million, respectively. The New Bonds will be secured by

the same collateral package as the New Term Loan.

D.     **The Settlement with the Derivative Counterparties to Effect the Concurso Plan**

13.     Prior to the filing of the Concurso Proceeding, in order to facilitate the

restructuring described above, CCM entered into standstill agreements with creditors holding an

aggregate of approximately 85% of the Eligible Debt (each a "Standstill Agreement" and,

collectively, the "Standstill Agreements").[10] As material inducement for the Derivative

Counterparties to enter into such Standstill Agreements, CCM and each Derivative

Counterparties also entered into agreements which acknowledge such Derivative Counterparty's

claim and settle such claim for the consideration described above and more fully in the Term

Sheet (each a "Settlement and Debt Acknowledgement Agreement"). The form of Standstill

Agreement, with the form of Settlement and Debt Acknowledgement Agreement attached as an

annex, executed by the Derivative Counterparties and CCM is attached hereto as **Exhibit 2**. The

Standstill Agreements provide that under certain terms and conditions set forth therein, holders

of Eligible Debt and CCM will agree to support and facilitate the restructuring on the terms and

conditions set forth in the Term Sheet and the Concurso Plan. The Standstill Agreements further

provide that pending the consummation of the restructuring embodied in the Term Sheet and the

Concurso Plan, each Creditor (as defined in each Standstill Agreement) that enters into a

---

[10]     Any discussion herein of the Standstill Agreements is qualified in its entirety by the actual terms and
conditions of the Standstill Agreements. In the event of any inconsistency between the summary contained
of the Standstill Agreements contained herein and the actual terms of the Standstill Agreements, the actual
terms of the Standstill Agreements shall control in all respects.

Standstill Agreement will forbear from exercising its rights and remedies in respect of certain debt and certain pending claims.

14.     Concurrently with entry into the Standstill Agreements, CCM and its subsidiaries entered into agreements with those creditors that executed Standstill Agreements, which obligate CCM and its subsidiaries, on the one hand, and those creditors executing Standstill Agreements, on the other hand, to use their reasonable best efforts, for a period not to exceed one year following the occurrence of a Release Event (as defined in the Standstill Agreements), to consummate a restructuring of CCM and/or its subsidiaries on an out-of-court basis on the same commercial and other terms as set forth in the Term Sheet and the Concurso Plan (each such agreement, a "Subsidiary Agreement" and, collectively, the "Subsidiary Agreements").[11]  A copy of a Subsidiary Agreement is attached hereto as **Exhibit 3**.

15.     The Standstill Agreements each provide that upon any termination pursuant to its terms that is not caused by a breach of such Standstill Agreement by CCM (or its principal operating subsidiary, Tiendas Comercial Mexicana, S.A. de C.V. ("TCM")) (any termination of a Standstill Agreement, a "Standstill Termination Event"),[12] CCM and such Creditor will have the

---

[11]     Any discussion herein of the Subsidiary Agreements is qualified in its entirety by the actual terms and conditions of the Subsidiary Agreements.  In the event of any inconsistency between the summary of the Subsidiary Agreements contained herein and the actual terms of the Subsidiary Agreements, the actual terms of the Subsidiary Agreements shall control in all respects.

[12]     Each Standstill Agreement provides for termination of the Standstill Agreement upon a variety of events, subject to any remaining obligations as set forth therein and any rights of cure as set forth therein.  For example, in the Standstill Agreements applicable to each Derivative Counterparty, such events include, among others: (i) termination of the Standstill Agreement by the relevant Derivative Counterparty upon notice to CCM if: (a) CCM breaches its obligations under the Standstill Agreement, the Subsidiary Agreement or Stipulation with the applicable Derivative Counterparty (subject to any applicable cure rights) or (b) CCM breaches any representations or warranties contained in the Standstill Agreement (*see* Ex.2 to Verified Petition, § 12(a)), (ii) termination by CCM or the Derivative Counterparty if the Federal District Court rejects the Concurso Plan, provided that each of the Derivative Counterparty and CCM shall be bound by Section 7 of the Standstill Agreement (Binding Obligation to Consummate the Restructuring) but only to the extent that such termination was not caused by a breach of the obligations herein by the other Party (or in the case of the Derivative Counterparty, TCM) and only so long as the conditions referred to in Section 7 are being satisfied (*see id.*, § 12(c)), (iii) an automatic termination upon the earlier of: (a) the consummation of the Restructuring (as defined in the Standstill Agreement attached to the Verified

obligations set forth in the relevant Subsidiary Agreement.  Upon the occurrence of a Standstill

Termination Event and the expiration or earlier termination of such Creditor's Subsidiary

Agreement (any such occurrence, a "Trigger Event"), the forbearances contained in the

Creditor's Standstill Agreement with CCM will terminate.  CCM and the DCP Plaintiffs have

agreed that upon the occurrence of a Trigger Event with respect to a DCP Plaintiff, any stays or

injunctive relief in effect in this Chapter 15 case will automatically be lifted without the need for

further order or action of the Court to allow the relevant DCP Plaintiff to: (i) send a notice

terminating its Standstill Agreement with CCM, to the extent such a notice is required under the

relevant Standstill Agreement, and (ii) exercise all of its rights and remedies (including, without

limitation, continuance of the Derivatives Litigation) against CCM and its assets, free of any stay

or injunction ordered by this Court.

16.     Prior to the filing of the Concurso Proceeding with the Federal District Court,

CCM entered into a stipulation with each of the DCP Plaintiffs, which was so ordered by the

New York Court (each a "Stipulation") staying the Derivatives Litigation pending completion of

the global settlement contained in the Term Sheet and the Concurso Plan.  A copy of a

Stipulation is attached hereto as **Exhibit 4**.  Each Stipulation provides that upon the occurrence

of a Trigger Event, the Stipulation will terminate, such that a DCP Plaintiff may elect to continue

the Derivatives Litigation and/or exercise any of its rights and remedies against CCM or its

assets.

---

Petition) or (b) the first anniversary of the Effective Date (as defined in the Standstill Agreement attached
to the Verified Petition); provided that such termination shall not affect the obligations, if any, of the parties
pursuant to Section 7 (Binding Obligation to Consummate the Restructuring), to the extent applicable (*see
id.*, § 12(d)).

**E.     Current Concurso Proceeding**

17.     As discussed above, in order to effectuate the global settlement contemplated in the Concurso Plan, on July 14, 2010, CCM filed the Concurso Petition with the Federal District Court.  A true and correct copy of the Concurso Petition is attached as **"Exhibit C"** to the Foreign Representative Declaration.[13]

18.     As set forth more fully in the del Castillo Declaration, following filing of the Concurso Proceeding, an examination will be held and the Federal District Court will issue a "business reorganization judgment" determining whether the Concurso Petition will be granted. If the Concurso Petition is granted, a stay similar to the Bankruptcy Code's automatic stay will be put in place enjoining creditors from taking any actions to enforce judgments or seize assets, and CCM will begin the process of reorganization.

19.     The Concurso Plan, which reflects the terms set forth in the Term Sheet and has been subscribed to by parties holding over 85% of CCM's outstanding indebtedness, was submitted along with the Concurso Petition.

**F.     Appointment of the Foreign Representative**

20.     The Petitioner is counsel to CCM in Mexico, and is authorized to bring this Chapter 15 Petition as the foreign representative of CCM pursuant to the resolution of CCM's shareholders, dated July 6, 2010 (the "Resolution").  A true and correct copy of the Resolution is attached as **"Exhibit A"** to the Foreign Representative Declaration.[14]

---

[13]     An English translation of the Concurso Petition is attached as **"Exhibit D"** to the Foreign Representative Declaration.

[14]     An English translation of the Resolution is also attached as **"Exhibit B"** to the Foreign Representative Declaration.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

22.     Venue is proper before this Court pursuant to 28 U.S.C. § 1410(2), which provides that venue is proper in a district in which there is a pending action against the debtor in Federal or State Court.  As the Derivatives Litigation is currently pending in New York County, within the Southern District of New York, this Court is a proper venue for the Chapter 15 Petition.

## RELIEF REQUESTED

23.     The Petitioner seeks entry of an order, substantially in the form attached hereto as **Exhibit 5**, pursuant to section 1517 of the Bankruptcy Code (i) recognizing the Concurso Proceeding as a foreign main proceeding and granting all of the relief afforded to such proceedings under section 1520 of the Bankruptcy Code, and (ii) recognizing the Petitioner as the duly appointed foreign representative of CCM.

## BASIS FOR RELIEF

**A.**     **The Petition Satisfies the Requirements of Section 1517 of the Bankruptcy Code**

24.     Section 1517(a) of the Bankruptcy Code sets forth the requirements for recognition of a foreign proceeding, and provides that, after notice and a hearing, the Bankruptcy Court will enter an order recognizing a foreign proceeding if (1) the foreign proceeding is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative seeking recognition is a person or body, and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code.  As set forth below, the Concurso Proceeding and this Chapter 15 Petition meet these requirements and the Concurso Proceeding should be recognized as a foreign main proceeding.

i.     *The Concurso Proceeding is a Foreign Main Proceeding*

25.     Section 1502(4) of the Bankruptcy Code defines a foreign main proceeding as "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4).

26.     As a threshold matter, the proceeding is a foreign proceeding under the Bankruptcy Code.  Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

27.     The Concurso Proceeding meets this definition because it is a collective administrative proceeding under the Concurso Law, administered in the Federal District, Mexico, which relates to insolvency and adjustment of debt.  The purpose of the Concurso Proceeding is to allow financially troubled debtors time to either craft and execute a plan of reorganization or go through an orderly liquidation of its assets.  The process is controlled by the court, which has authority at the outset to grant or deny the Concurso Petition and has review and approval rights of any plan of reorganization filed by the debtor.  While the Chapter 15 Petition has been filed concurrently with the filing of the Concurso Petition, until the Federal District Court enters its "business reorganization judgment" granting CCM's Concurso Petition, CCM will not be seeking entry of an order recognizing the Concurso Proceeding as a foreign main proceeding ("Recognition Order").  Concurrently with the filing of the Chapter 15 Petition, CCM has commenced an adversary proceeding in this Court seeking certain provisional injunctive relief pursuant to sections 105(a), 1507 and 1519 of the Bankruptcy Code pending recognition of the Concurso Proceeding as a "foreign main proceeding" by this Court (such proceeding, the

"Adversary Proceeding"). Once the Federal District Court grants the Concurso Petition, CCM will file appropriate notices and seek entry of the Recognition Order at this Court's earliest convenience.

28.    Under the Concurso Law, though the debtor remains in control of its business and operations, the process of forming the plan of reorganization is overseen by a court appointed administrator, the *conciliador*, which maintains powers similar to those of the United States Trustee in a proceeding under the Bankruptcy Code.[15]  For these reasons, CCM's assets are "subject to control or supervision by a foreign court" and all of the requirements of section 101(23) are met.  Further, the Bankruptcy Court for the Southern District of New York has previously recognized a proceeding under the Concurso Law as a foreign proceeding under Chapter 15 of the Bankruptcy Code.  *See In re Corporacion Durango, S.A.B. de C.V.*, No. 08-13911 (RDD) (Bankr. S.D.N.Y. Dec. 11, 2008) (Mexican Concurso proceeding recognized as a foreign proceeding).[16]

29.    Once it is determined that the Concurso Proceeding is a foreign proceeding, it must be shown that the Concurso Proceeding is located in the center of CCM's main interests. Although the Bankruptcy Code does not provide a conclusive test to determine a debtor's center of main interests, pursuant to section 1516 of the Bankruptcy Code it is presumed, absent evidence to the contrary, that the debtor's center of main interests is its registered office. 11 U.S.C. § 1516(c).  The concept of center of main interests has been equated by courts to the concept of a debtor's "principal place of business."  *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006).

---

[15]    A more detailed discussion of the Concurso Proceeding is included in the del Castillo Declaration.

[16]    Although the petition for recognition was filed prior to the Mexican court's "business reorganization judgment," the final hearing on the petition was not held and the order recognizing Corporacion Durango's concurso proceeding as a foreign main proceeding was not entered until the Mexican Court issued its "business reorganization judgment" allowing Corporacion Durango's concurso.

30.     There is no doubt that Mexico is CCM's "center of main interests."  CCM is headquartered in Mexico City, all of its stores are located in Mexico, the vast majority of its assets are located in Mexico and all of its employees are located in Mexico.  Additionally, CCM's registered office is located in Mexico, and therefore it is presumed that CCM's center of main interests is in Mexico.  As the Concurso Proceeding is a foreign proceeding located in CCM's center of main interests, it is therefore a "foreign main proceeding" under the Bankruptcy Code.

ii.     *The Foreign Representative is a Person*

31.     The second requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a person or body.  *See* 11 U.S.C. § 1517(a)(2).

32.     This chapter 15 case was commenced by the Petitioner, an individual who serves as counsel to CCM in Mexico, and who has been duly appointed and authorized to serve as CCM's "foreign representative" pursuant to the Resolution.

33.     The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

34.     Courts in this district have on numerous occasions held that a foreign representative may be appointed by the debtor's Board of Directors, and need not be appointed

by the foreign court overseeing the foreign proceeding.[17] *See, e.g., In re Bd. of Dirs. of Hopewell*, 275 BR. 699, 707 (S.D.N.Y. 2002) (holding that company's board of directors qualified as foreign representative); *see also In re Bd. of Dirs. of Telecom Argentina S.A.*, No. 05-17811(BRL), 2006 WL 686867, at *21 (Bankr. S.D.N.Y. Feb. 24, 2006) (same); *In re Netia Holdings*, 277 B.R. 571, 587 n.76 (Bankr. S.D.N.Y. 2002) (same). Neither section 101(24) nor chapter 15 of the Bankruptcy Code requires foreign representatives to be appointed by foreign courts. *See In re Hopewell*, 275 BR. 699, 707 (S.D.N.Y. 2002) (interpreting prior version of section 101(24) of the Bankruptcy Code and stressing that "nothing in the statute requires a court appointment"). Although there is little authority interpreting the current version of section 101(24), nothing in the plain text of the statute requires that a foreign representative be appointed by court order. Rather, section 101(24) simply requires that such representative be "authorized" to administer the reorganization or the liquidation of the debtor's assets or affairs or act as a representative of the foreign proceeding. *See* 11 U.S.C. § 101(24).

35. Further, in *In re Corporacion Durango, S.A.B. de C.V.*, this Court recognized, in a case involving in a proceeding under the Concurso Law, an officer of the debtor as a duly authorized foreign representative of the debtor within the meaning of sections 101(24) and 1517(a)(2) of the Bankruptcy Code. The foreign representative was not appointed by the Court, but was instead appointed by the debtor's Board of Directors prior to the filing of its concurso

---

[17]     The definition of "foreign representative" was amended in 2005 as follows (italicized text representing additions, and stricken text representing deletions):

> *The term* "foreign representative" means ~~duly selected trustee, administrator, or other representative of an estate in a foreign proceeding~~ *a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding*.

*See* 2 Collier on Bankruptcy ¶ 101.24.

proceeding. *See In re Corporacion Durango, S.A.B. de C.V.*, No. 08-13911 (RDD) (Bankr.

S.D.N.Y. December 11, 2008).

36.     The Petitioner, an individual duly appointed by CCM's Board of Directors, is the

duly appointed foreign representative of CCM.  As such, the requirement of section 1517(a)(2)

of the Bankruptcy Code has been satisfied.

     iii.     *The Procedural Requirements of Section 1515 of the Bankruptcy Code Have Been Met*

37.     The final requirement for recognition of a foreign main proceeding is compliance

with the procedural requirements of section 1515 of the Bankruptcy Code.  Section 1515 requires

that a petition be filed with the court and lists the documents and statements that must

accompany the petition for recognition.  11 U.S.C. § 1515.

38.     All of the requirements of section 1515 of the Bankruptcy Code have been met.

First, this chapter 15 petition was properly commenced by the Petitioner on behalf of CCM

through the filing of the Chapter 15 Petition, as required by section 1515(a) of the Bankruptcy

Code.

39.     Second, the appointment of the Petitioner as foreign representative and evidence

of the existing Concurso Proceeding, in the form of the Resolution and Concurso Petition, have

been provided as Exhibits A and C, respectively, of the Foreign Representative Declaration, as

required under section 1515(b).  Additionally, English translations of the Resolution and

Concurso Petition, as required by section 1515(d) of the Bankruptcy Code, are attached as

Exhibits B and D of the Foreign Representative Declaration, respectively.

40.     Finally, pursuant to section 1515(c), the Foreign Representative Declaration

includes a statement identifying the Concurso Proceeding as the only foreign proceeding

currently pending with respect to CCM.  *See Foreign Representative Declaration* at 12.

**B.** **CCM is Entitled to Relief Under Section 1520 of the Bankruptcy Code**

41.     Section 1520 of the Bankruptcy Code sets forth a series of statutory protections, including the automatic stay, that become effective automatically upon the entry of an order recognizing a foreign main proceeding.  *See* 11 U.S.C. § 1520.  As such, the Petitioner respectfully submits that no further showing is needed on the issue.

**C.** **The Limited Modification of the Stay and Injunctions Approved by this Court Upon the Occurrence of a Trigger Event is Appropriate**

42.     As part of its settlement with the DCP Plaintiffs, and as discussed above, CCM has agreed that upon the occurrence of a Trigger Event with respect to a Standstill Agreement between CCM and a DCP Plaintiff, any stays and/or injunctive relief in effect in this chapter 15 case, including the automatic stay of section 362 of the Bankruptcy Code, will automatically be lifted without the need for further order or action of the Court with respect to such DCP Plaintiff for the limited purpose of allowing such DCP Plaintiff to: (i) send a notice terminating its Standstill Agreement with CCM (to the extent such notice is required pursuant to the terms of the relevant Standstill Agreement) and (ii) exercise all of its rights and remedies (including, without limitation, continuance of the Derivatives Litigation) against CCM and its assets, free of any stay or injunction ordered by this Court.  As such, and in order to allow CCM to fulfill its obligations to creditors in respect of the Concurso Proceeding, CCM hereby respectfully requests that this Court include in any Order granting recognition of the Concurso Proceeding as a "foreign main proceeding" a provision allowing for limited relief from any stays and/or injunctive relief in effect in this chapter 15 case on the terms specified above.

43.     Such a limited modification of the stays and injunctive relief to be imposed pursuant to the Order is appropriate given the consensual nature of the restructuring to date.  In negotiating the terms of the comprehensive restructuring with CCM, the DCP Plaintiffs have

agreed to forbear from exercising their rights and remedies against CCM, including agreeing to a stay of the Derivatives Litigation, even though such litigation has progressed to the loss calculation phase. However, such forbearance has always been intended to be limited in nature. Specifically, although it is the intent of CCM and all parties that have entered into Standstill Agreements and Subsidiary Agreements to consummate the Concurso Plan (or to consummate the restructuring on an out of court basis), if the restructuring does not progress along the lines set forth in the Standstill Agreements and the Subsidiary Agreements, the DCP Plaintiffs, having participated in a consensual restructuring effort, should not be delayed in pursuing their rights.

## NOTICE

44.    Notice of this Chapter 15 Petition has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the Indenture Trustees under the 2015 Notes, the 2027 Notes and the 2010 Notes (for distribution to the Noteholders), (iii) Cleary Gottlieb Steen & Hamilton LLP, counsel to the Derivative Counterparties, (iv) Bingham McCutchen LLP, U.S. counsel to the Ad Hoc Group of Noteholders,  (v) Clifford Chance US LLP, U.S. counsel to the Commercial Banks and (vi) all known U.S. and foreign creditors of CCM.  The Debtor submits that no other or further notice need be provided.

## NO PRIOR REQUEST

45.    No previous request for the relief requested herein has been made to this or any other court.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that this Court enter an order (i) granting the relief requested herein and (ii) granting such other and further relief as the Court deems proper and just.

Dated: July 16, 2010
      New York, New York

Respectfully submitted,

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP

/s/ Gary L. Kaplan
Gary L. Kaplan
Peter B. Siroka
One New York Plaza
New York, New York 10004
Telephone:    (212) 859-8000
Facsimile:    (212) 859-4000

*Attorneys for Fernando del Castillo Elorza
as Foreign Representative of Controladora
Comercial Mexicana, S.A.B. de C.V.*

## <u>VERIFICATION</u>

Fernando del Castillo Elorza hereby declares:

1.      I am counsel to Controladora Comercial Mexicana, S.A.B. de C.V. in Mexico, and have been authorized by the Board of Directors to commence this ancillary case.

2.      I have read the foregoing Chapter 15 Petition and I am informed and believe that the factual allegations contained therein are true and correct.

3.      I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   Mexico D.F., Mexico
         July 16, 2010

                           /s/ Fernando del Castillo Elorza
                           Fernando del Castillo Elorza