# <u>EXHIBIT 1</u>

**Restructuring of Controladora Comercial Mexicana, S.A.B. de C.V.**

_____

**Summary of Terms and Conditions**

**July 1, 2010**

_____

The following is an indicative summary of terms and conditions (this "Term Sheet") for a proposed restructuring (the "Restructuring") of Eligible Claims and Debt (as defined below) of Controladora Comercial Mexicana, S.A.B. de C.V. ("Comerci").

This Term Sheet (and communications concerning it) is being provided in furtherance of settlement discussions entered into by Comerci with the Participating Claimants (as defined below), and it is entitled to the protections from use or disclosure afforded by C.P.L.R. Section 4547, Fed. R. Evid. 408 and any similar U.S. or Mexican state, federal or other applicable rule that restricts or prohibits disclosure or use. All statements made in this Term Sheet or in communications concerning it are in the nature of settlement discussions and compromise, are not intended to be and do not constitute representations of any fact or admissions of any liability, are to be used only for the purpose of attempting to reach a consensual compromise and settlement, and are not admissible in any court.

This Term Sheet is not intended to describe or include all of the terms and conditions of the transactions summarized herein or to set forth the definitive contractual language of any provisions summarized below. This Term Sheet is intended for discussion purposes only. Nothing in this Term Sheet will obligate any party to restructure any debt of Comerci or will constitute an admission of any fact or circumstance or recognition of the validity of any claims filed against Comerci by any Participating Claimant, and this Term Sheet is neither an expressed nor implied commitment by any Participating Claimant or any of their respective affiliates to provide any financing, to provide or purchase any loans or securities in connection with the transactions contemplated hereby or to provide or assist in providing the financing described herein, which commitment, if any, will only be as set forth in a separate commitment letter or other applicable type of agreement. Any such commitment will be subject to, among other things, (i) satisfactory transaction structure and documentation, (ii) satisfaction with due diligence, including third party reports and business plan, (iii) internal approval by each Participating Claimant and (iv) other standard conditions for transactions of this type.

If the Restructuring is not consummated according to the terms herein, subject to the terms of the lock-up/restructuring agreements the parties reserve their respective rights to (i) seek a restructuring of the Eligible Claims and Debt (as defined below) pursuant to any available proceeding, scheme or arrangement under Mexican or other insolvency law or (ii) proceed pursuant to an out-of-court settlement or other means of payment or litigation. This Term Sheet is not a solicitation for approval of any plan (_convenio_) under the Mexican Business Reorganization Law (_Ley de Concursos Mercantiles_, the "Concurso Law"), any plan of reorganization pursuant to title 11 of the United States Code (the "U.S. Bankruptcy Code") or any other applicable law (including any U.S. securities or other laws), but the terms and conditions described herein may become the basis for a _convenio_, if supported by the requisite creditors under the Concurso Law. The consummation of the transactions described herein may be subject to the provisions of the Concurso Law, including the use of the pre-pack provisions therein (_concurso mercantil con plan de reestructura previo_) and approval by the relevant court.

1

Concurrently with the execution of (i) the lock up/restructuring agreements (ii) the pre-pack plan request for *concurso* and (iii) the irrevocable powers of attorney, Comerci will enter into a settlement and debt acknowledgment agreement with the Derivative Counterparties (as defined below) pursuant to which (a) the parties will settle all Derivative Claims (as defined below), and (b) Comerci will acknowledge and agree that the Derivative Claims constitute a settled payment obligation, due and payable by Comerci to the respective Derivative Counterparties.

**For Residents of all States:**

**IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE NEW BONDS (AS DEFINED BELOW) HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE NEW BONDS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

**For Florida Residents:**

**THE NEW BONDS OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT. THE NEW BONDS HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, IF SALES ARE MADE TO FIVE OR MORE PERSONS IN FLORIDA, ALL FLORIDA PURCHASERS SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER, OR AN ESCROW AGENT.**

**I. Summary of the Restructuring**

For purposes of this Term Sheet, the following terms will have the meanings set forth below:

"Effective Date" means no later than 15 calendar days after the date on which the publication of judgment issued by the Mexican Court with respect to the approval of the plan of reorganization (*convenio concursal*) filed by

Comerci with the Mexican Court becomes effective.

"Value Date" means July 1, 2010.

"Eligible Claims and Debt" means:

1. the unsecured close-out amounts under any and all derivative agreements (the "Derivative Claims") between Comerci and each financial institution identified in Schedule 2 hereof (each a "Derivative Counterparty", and collectively, the "Derivative Counterparties");

2. the unsecured loans identified in Schedule 3 hereof (the "Loans") owed to the financial institutions identified therein (the "Commercial Banks"); and

3. the unsecured U.S. dollar, Mexican Peso and UDI denominated bonds identified in Schedule 4 hereof (the "Bonds").

"Obligations" means all advances, debts, liabilities, obligations, covenants and duties arising under the Facilities and any related documentation owing by Comerci and any of the Guarantors (as defined below) to any Participating Claimants (as defined below) thereunder, the administrative agents, the collateral agents, the trustee under the indenture for the New Bonds or any indemnified person, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising.

"Participating Claimants" means, collectively, the Commercial Banks, the Derivative Counterparties and the holders of the Bonds (the "Bondholders").

The Restructuring is comprised of three separate financial packages (each a "Financial Package", and collectively, the "Financial Packages") to accommodate the different creditor groups. Each package is comprised of some combination of the following facilities, with the particular composition of each Financial Package detailed in Schedule 1 of this Term Sheet:

- a multi-tranche secured sustainable debt facility (the "Secured Sustainable Debt Facility");

- secured bond facilities comprised of US dollar and Peso bonds (the "New Bonds"); and

- a multi-tranche secured asset-linked facility (the "Asset-Linked Facility" and together with the Secured Sustainable Debt Facility and the New Bonds, the "Facilities").

The Derivative Counterparties will be entitled to the recovery detailed in Financial Recovery Package 1 (the "Derivative Counterparties Financial Package"). The Commercial Banks will be entitled to the recovery detailed in Financial Recovery Package 3 (the "Commercial Banks Financial Package"). The Bondholders will be entitled to the recovery detailed in Financial Recovery Package 2 (the "Bondholders Financial Package").

No later than 3 business days from the Effective Date (the "Closing Date"), all outstanding principal amounts under the Loans, the Bonds, and the Derivative Claims and together with, in each case, all past due and unpaid principal, interest and any penalties thereon will be cancelled or otherwise settled, amended, restated or exchanged against receipt by each Participating Claimant of a *pro rata* interest in the respective Financial Packages assigned to such Participating Claimant as reflected in the pre-packaged plan of reorganization (*plan de reestructura previo* and *convenio concursal* (collectively, the "Concurso Mercantil Plan")). The intercreditor arrangement among the Participating Claimants will be set forth in a master intercreditor and collateral sharing agreement (the "Intercreditor and Collateral Agreement").

For purposes of the Restructuring, the parties acknowledge and agree that (i) the intercompany debt as set

forth in the schedules to the definitive documentation of the Facilities will not be part of the Restructuring and will remain outstanding following the conclusion of the Restructuring, but all such intercompany debt will be contractually subordinated to the Facilities and recognized as a subordinated claim for purposes of the Concurso, and Comerci will agree to implement a contractual arrangement to cause the holders of such intercompany debt to vote it in the Concurso in the same manner as all the creditors that have entered into a lock-up agreement, and (ii) the holders of Comerci's outstanding peso-denominated Mexican commercial paper *(certificados bursátiles)* (the "Cebures") will not be part of the Restructuring and will be restructured pursuant to an exchange offer effectuated in Mexico, the terms of which are described in the exchange offer filed with the *Comisión Nacional Bancaria y de Valores* ("CNBV").

## II. The Secured Sustainable Debt Facility

*Instrument*.................................................. Multi-tranche secured loan facility.

*Indicative Amount*.................................... MXP$8,662.49 million in two tranches:

- amortizing Mexican peso tranche with a principal amount of MXP$5,254.77 million ("Tranche I"); and

- bullet Mexican peso tranche with a principal amount of MXP$3,407.73 million ("Tranche II", together with Tranche I, the "Tranches").

  Each of the Commercial Banks and the Derivative Counterparties will be entitled to receive its *pro rata* share of the above Tranches based on the Financial Package for which it is eligible.

*Final Maturity* ......................................... June 30, 2018.

*Principal Repayment and Amortizations*............................................ The principal of Tranche I will be due and payable (i) on a monthly basis from the Value Date through June 30, 2011, and (ii) on a quarterly basis in each year thereafter, as a percent of the original aggregate principal amount, up to the outstanding principal amount, as follows:

- from (and including) the Value Date through June 30, 2011: 0.1% each month;

- from (and including) July 1, 2011 through June 30, 2013: 1.25% each quarter;

- from (and including) July 1, 2013 through June 30, 2017: 2.50% each quarter; and

- from (and including) July 1, 2017 through June 30, 2018: 2.50% in each of the first three quarters, and 41.30% on the eighth anniversary of the Value Date.

  Any outstanding principal of Tranche II will be due and payable in full on the eighth anniversary of the Value Date.

  Principal from the Value Date to the Closing Date will be held by Comerci for the benefit of the creditors and paid on the Closing Date.

4

| | |
|---|---|
| *Pricing* ..................................................... | Subject to the provisions below, interest will accrue from the Value Date and be payable in cash (i) monthly in arrears from the Value Date to June 30, 2011and (ii) quarterly in arrears thereafter. |

Tranche I and Tranche II will bear interest on the outstanding principal amount at an annual rate equal to the 28-day TIIE (to be defined in the definitive documentation) from (and including) the Value Date through June 30, 2011 and the 91-day TIIE in each year thereafter plus the margins listed below (the "<u>TIIE Facility Rate</u>"):

- from (and including) the Value Date through June 30, 2012: 2.75%; and

- from (and including) July 1, 2012 to maturity: 4.0%.

Interest from the Value Date to but not including the Closing Date will be held by Comerci for the benefit of the Creditors and paid on the Closing Date as part of the advisory / restructuring fee.

On each interest payment date on or before June 30, 2014, Comerci may elect to capitalize interest accrued and payable under either or both of the Tranches on the applicable interest payment date in excess of the amounts provided below by delivering a notice to the administrative agent at least five (5) business days prior to the applicable interest payment date for which Comerci has elected to capitalize interest; <u>provided</u> that Comerci's *pro forma* cash balance (to be defined in the definitive documentation) is less than or equal to MXP$600,000,000 at such time and no Default or Event of Default (to be defined in the definitive documentation) has occurred and is continuing:

- from (and including) the Value Date through June 30, 2011: 7.5%;

- from (and including) July 1, 2011 through June 30, 2012: 8.0%;

- from (and including) July 1, 2012 through June 30, 2013: 8.5%; and

- from (and including) July 1, 2013 through June 30, 2014: 9.0%.

| | |
|---|---|
| *Default Rate* ............................................. | Upon the occurrence and during the continuance of an Event of Default (other than a payment Event of Default), amounts outstanding under the Secured Sustainable Debt Facility will bear interest payable in cash on demand at the TIIE Facility Rate <u>plus</u> 2.0%. |

Upon the occurrence and during the continuance of a payment Event of Default and upon acceleration as a result of any Event of Default, amounts outstanding under the Secured Sustainable Debt Facility will bear interest payable in cash on demand at the TIIE Facility Rate multiplied by 2.

| | |
|---|---|
| *Collateral* ................................................. | The Secured Sustainable Debt Facility and the New Bonds will be secured, on a pari passu basis, by a first-priority security interest through pledges/*prendas* and mortgages/*hipotecas civiles*, as the case may be (at Comerci's expense), in favor of the holders of Secured Sustainable Debt |

Facility and the New Bonds in the following:

(i) all of the capital stock owned by Comerci, directly or indirectly, in each of the Guarantors (as defined below) (other than capital stock currently serving as collateral for the Scheduled Working Capital Debt Facilities (to be defined in the definitive documentation) and Credit Support Facilities (to be defined in the definitive documentation)) with the understanding that Comerci will have the right to exercise all corporate and economic rights on the pledged stock, except upon the occurrence and during the continuance of an Event of Default;

(ii) all real estate assets of Comerci and its subsidiaries with a value of MXP$50,000,000 or more, provided that such real estate assets' book value will be no less than MXP$10,564,362,302.00 (the Commercial Banks will agree with Comerci on a reasonable method to verify that the book value of the mortgaged real estate does not decrease from its commercial value by more than 10% or, otherwise, additional assets will have to be mortgaged) other than (A) any real estate assets serving as collateral for any Scheduled Working Capital Debt Facilities and Credit Support Facilities, (B) the Asset-Linked Collateral, (C) the collateral securing the Cebures as disclosed in the exchange offer filed with the CNBV and (D) the PSI Real Estate (as defined below), it being understood that any such real estate's insurance policies will be endorsed in favor of the collateral agent for the benefit of the Participating Claimants;

(iii) any collateral that at any time ceases to secure any Scheduled Working Capital Debt Facility and/or any Credit Support Facility;

(iv) the cash account established by Comerci and maintained for and on behalf of the Participating Claimants, solely for the benefit of the Participating Claimants, (the "Creditor Proceeds Account") and any funds or securities therein, to the extent of the Participating Claimants' portion (as applicable) of Excess Cash Flow (as defined below), net cash proceeds received from the sale or disposition of property (including the Sustainable Debt Collateral), equity issuances, casualty events and insurance and other mandatory prepayments; and

(v) the Participating Claimants' *pro rata* share of the cash account established in the name of Comerci to hold Comerci's portion of any Excess Cash Flow and/or net cash proceeds pursuant to the definitive documents (the "Comerci Proceeds Account") and any funds or securities therein, to the extent held for reinvestment in connection with an asset sale or casualty event;

and, in the case of each of the foregoing:

(1) the proceeds of any of the foregoing; and

(2) any of the foregoing to the extent acquired by Comerci or its subsidiaries after the definitive documentation for the Facilities is executed

(collectively, the "<u>Sustainable Debt Collateral</u>").

*Guarantors* ............................................... All existing direct and indirect subsidiaries of Comerci and all future direct or indirect subsidiaries of Comerci, except for (i) Costco and its Subsidiaries and (ii) each existing and future permitted joint venture, so long as Comerci's ownership of such joint venture is 50% or less and Comerci does not otherwise control such joint venture (the "<u>Guarantors</u>").

Excess Cash ............................................. Comerci will apply semi annually not less than 60% of Excess Cash Flow (as defined below) to prepay, on a *pro rata* basis, first, any capitalized interest, and second, the outstanding principal amount (and accrued and unpaid interest), in each case of the Secured Sustainable Debt Facility (the "Excess Cash Flow Sweep").  Any such prepayments will be applied *pro rata* to the remaining principal payments of each Tranche.

The excess cash flow (the "Excess Cash Flow") will be calculated assuming a minimum *pro forma* cash balance in amounts to be agreed by the Parties in the definitive documentation.

The parties will consider a credit mechanism, to be set forth in the definitive documentation, pursuant to which any calculation of the 60% of Excess Cash Flow for any period to be applied in mandatory prepayment pursuant to the above paragraphs will be net of any optional prepayments to the Secured Sustainable Debt Facility by Comerci during such period to the extent such prepayments (i) were made on a *pro rata* basis between the Tranches of the Secured Sustainable Debt Facility and among remaining installments within each such Tranche to the extent applicable and (ii) were not funded pursuant to any equity issuance or the incurrence of new indebtedness.

Comerci will be entitled to use 40% of the Excess Cash Flow generated by the business for certain specifically enumerated purposes as set forth in "—Use of Cash Entitled to Comerci" below.

The Excess Cash Flow calculation will be (i) made on or before the date on which financial statements are required to be delivered in respect of the quarterly or annual periods ended June 30th and December 31st of each year and (ii) accompanied by an officer's certificate signed by Comerci's chief financial officer and one other senior officer of Comerci certifying in reasonable detail each such Excess Cash Flow calculation.

The portion of Excess Cash Flow to be prepaid to the Secured Sustainable Debt Facility will be deposited into the Creditor Proceeds Account. Comerci's share of Excess Cash Flow will be deposited into the Comerci Proceeds Account and will be applied by Comerci as set forth in "—Use of Cash Entitled to Comerci" below.

Prepayments of the Secured Sustainable Debt Facility in respect of the Excess Cash Flow Sweep will be made within 30 days of the Excess Cash Flow calculation.

*Use of Cash Entitled to Comerci* .............. Comerci will be entitled to use any amounts deposited into the Comerci Proceeds Account pursuant to the definitive documentation to: (a) make optional prepayments of indebtedness that is *pari passu* with the Facilities, as provided in "—Optional Prepayments & Repurchases" below, (b) make below-par purchases of (i) the New Bonds or (ii) loans under any of the other Facilities, as provided in "—Optional Prepayments & Repurchases" below, (c) make Additional Capital Expenditures (to be defined in the definitive documentation), and/or (d) for any other general corporate purposes, other than Restricted Payments that are not Permitted Dividends (as defined under "—Limitations on Restricted Payments" below).

*Optional Prepayments & Repurchases* ..... Comerci may, with the amounts in the Comerci Proceeds Account, prepay the Secured Sustainable Debt Facility, the Asset-Linked Facility and the New Bonds at any time, without penalty or other payment (other than customary break funding costs), or repurchase (x) the New Bonds (in the open market) or (y) loans under the Secured Sustainable Debt Facility or the Asset-Linked Facility in accordance with a Dutch auction mechanism to be specified in the definitive documentation, in each case, in whole or in part, subject to the terms of and in accordance with each Facility. Any such prepayment will be made upon at least five (5) business days' prior written notice to the administrative agent under such Facility.

Any prepayment of any Facility may not reduce any scheduled amortization payment to occur in the four (4) Fiscal Quarters immediately following the event giving rise to such deposited amounts below 50% of the original amount due and payable. All remaining amortizations of such Facility will be prepaid on a *pro rata* basis.

Additionally, Comerci may prepay the Secured Sustainable Debt Facility at any time with cash on hand, provided that any such prepayment is applied only to the Secured Sustainable Debt Facility (and not the Asset-Linked Facility or the New Bonds) and any such prepayment is applied *pro rata* among all Tranches of the Secured Sustainable Debt Facility and *pro rata* with respect to all amortizations of each Tranche.

*Mandatory Prepayments* ........................... *Equity Issuance*. Within five (5) business days of the financial closing of any equity issuance, Comerci will apply at least 50% of the net cash proceeds of such issuance (excluding net cash proceeds received upon exercise of stock options by employees or directors of Comerci or any subsidiary) to prepayment of the Obligations in accordance with the terms of the Intercreditor and Collateral Agreement. A maximum of 50% (and 100% upon exercise of stock options by employees or directors of Comerci or any subsidiary) of the net cash proceeds of any equity issuance will be cash entitled to Comerci and will be used for certain specifically enumerated purposes as set forth in "—Use of Cash Entitled to Comerci" above.

*Sales of Secured Sustainable Debt Collateral*. Within five (5) business days of the closing of any sale of the Sustainable Debt Collateral, 100% of such proceeds will be applied to prepay the Obligations in accordance with the terms of the Intercreditor and Collateral Agreement.

*Sales of Asset-Linked Collateral*. In the event that the amount of Asset-

Linked Collateral Proceeds (as defined under "*III. The Asset-Linked Facility—Mandatory Prepayments*") exceeds the outstanding principal amount (and accrued and unpaid interest) under the Asset-Linked Facility, Comerci will apply no less than 60% of the excess Asset-Linked Collateral Proceeds to prepay the Secured Sustainable Debt Facility and the New Bonds in the manner specified in the Intercreditor and Collateral Agreement, and the remaining 40% will be deposited in the Comerci Proceeds Account and will be cash entitled to Comerci and will be used for certain specifically enumerated purposes as set forth in "—Use of Cash Entitled to Comerci" above.

*Sales of Property Other than Collateral.* Within five (5) business days of the closing of any sale of other Property of Comerci or the Guarantors (other than the Sustainable Debt Collateral, Asset-Linked Facility Collateral and PSI Real Estate), 100% of such proceeds will be applied to prepay the Obligations in accordance with the terms of the Intercreditor and Collateral Agreement to the extent that such proceeds have not been reinvested within the time period and up to the limit set forth in the definitive documentation.

The definition of an "asset sale" for purposes of the foregoing will contain customary carve-outs (other than with respect to the Sustainable Debt Collateral or the Asset-Linked Collateral) for transactions of this nature, including, but not limited to, carve-outs for dispositions of inventory, worn-out, obsolete or damaged property or equipment.

With respect to any asset sale, Comerci will, and will cause each of its subsidiaries to, receive consideration equal to or exceeding the then fair market value of the asset sold, and 100% of the consideration received from such asset sale will be in the form of cash or cash equivalents.

*Other Proceeds.* Mandatory prepayments will also be required within five (5) business days of the receipt by Comerci or any of its subsidiaries of (i) proceeds from casualty losses, subject to customary exceptions (including, for the avoidance of doubt, customary reinvestment periods below a specified threshold), (ii) cash received in respect of the twelve (12) properties to be specifically identified in the definitive documents ("PSI Real Estate") that is not reinvested in certain investments ("Permitted Strategic Investments") and used in the development of operating stores on the PSI Real Estate and the real property of third parties by third parties in exchange for PSI Real Estate and (iii) a *pro rata* amount of any non-*pro rata* payments made to Indebtedness other than the Facilities, except as permitted with cash entitled to Comerci. These mandatory prepayments will be applied in accordance with the Intercreditor and Collateral Agreement.

Any and all mandatory prepayments to the extent applicable to the Secured Sustainable Debt Facility and the New Bonds will be applied *pro rata* between such Facilities and within each Facility between Tranches and with respect to Tranche I *pro rata* among the remaining amortizations of principal.

All mandatory prepayments will be deposited into the Creditor Proceeds

Account.

*Other Terms*................................................ The Secured Sustainable Debt Facility will include other customary definitions, terms and conditions (subject to certain customary exceptions for transactions of this nature), including, without limitation:

(i) representations and warranties customary for facilities of this type, including as to: corporate existence and power; authorization and enforceability of transaction documents and no contravention; no additional authorizations; binding effect; litigation and compliance with laws (including Social Security Legislation and Securities Act of 1933); financial statements and other information; no material adverse effect; no defaults; no contingent liabilities; priority of Obligations; taxes; environmental matters; assets and intellectual property;  insurance; subsidiaries; commercial acts; proper legal form; Investment Company Act of 1940, as amended; margin regulations; foreign pension plans; labor matters; security documents; priority of security interests and UCC matters; anti-terrorism laws; existing indebtedness; affiliate transactions; hedging agreements and hedging policy; collateral and guaranties; and no Bonds are held by Comerci or its affiliates;

(ii) affirmative covenants (including, without limitation, with respect to delivery of financial statements; reports, accountants' letters (to be audited by an internationally-recognized accounting firm), officers' certificates and other information reasonably requested by the Participating Claimants; notice of other material events, maintenance of existence; maintenance of property and insurance; maintenance of government approvals, material licenses, permits and franchises; payment of taxes and other obligations; ranking of Obligations; commercially reasonable efforts to obtain within a reasonable period following the Closing Date and, thereafter, to maintain at all times a rating from either S&P or Moody's; maintenance of current ownership in significant subsidiaries (other than in connection with a permitted asset sale); compliance with laws; maintenance of books and records; covenant to guarantee and give security; compliance with hedging policy; intercompany indebtedness; compliance with the Concurso Mercantil Plan, appointment of an independent financial advisor for a period of two (2) years following the Closing Date and further assurances, in each case with customary exceptions, if any, to be agreed;

(iii) financial covenants (including (A) an interest coverage test and (B) a leverage test to be based on the Leverage Ratio (as defined below));

 (iv) negative covenants (with certain customary exceptions to be agreed) restricting (A) liens, (B) investments, (C) mergers, consolidations, sales and leases, (D) restricted payments, (E) burdensome agreements, (F) transactions with affiliates, (G) changes to constitutional documents or documents evidencing other debt, (H) fundamental changes asset sales or exchanges and acquisitions, (I) capital expenditures, (J) voluntary prepayment of other indebtedness, (K) incurrence of additional indebtedness, (L) hedging transactions, (M) intercompany indebtedness,

(N) equity issuances and (O) Costco shares;

(v) indemnities; and

(vi) events of default customary for facilities of this type including as to: non-payment or failure to prepay; specified covenant defaults; other covenant defaults; cross-default; inaccuracy of representations or warranties in any material respect; voluntary and involuntary bankruptcy and insolvency events; material judgments; unenforceability of the transaction documents; expropriation; change of control; security documents; loss of necessary governmental approvals; nonpayment of Closing Date payments; and merger, consolidation, dissolution, liquidation or transfer of all or substantially all assets of Costco.

"<u>Leverage Ratio</u>" means, on any relevant testing date, the ratio of (a) Total Indebtedness (excluding letters of credit, surety bonds, bankers acceptances and similar instruments and the Asset-Linked Facility, with the exception of any Tranche A1 Deficiency (as defined below)) of Comerci and its Non-Costco Consolidated Subsidiaries on such date to (b) Consolidated EBITDA of Comerci and its Non-Costco Consolidated Subsidiaries determined for the measurement period ended on such date (or, if such date is not the last day of a Fiscal Quarter, the last day of the most recent Fiscal Quarter ended prior to such date). All calculations or determinations with respect to the Leverage Ratio will be made in Mexican Pesos.

### III. The Asset-Linked Facility

*Instrument*.................................................. Multi-tranche secured loan facility.

*Indicative Amount*..................................... MXP$5,766.67 million, in two tranches:

- Tranche A1: MXP$4,150.74 million; and

- Tranche A2: MXP$1,615.93 million minus the amount of any cash proceeds paid by Comerci to the Tranche A2 creditors on the Closing Date from Additional Tranche A2 Collateral Sales made before the Closing Date.

Each of the Commercial Banks and the Derivative Counterparties will be entitled to receive its pro rata share of the above tranches based on the Financial Package for which it is eligible.

*Tranche A1 Maturity Date*........................ June 30, 2016 (the "Tranche A1 Original Maturity Date"); provided that any Tranche A1 Deficiency will be due and payable on June 30, 2019 as described under "—Tranche A1 Collateral" below.

*Tranche A2 Maturity Date*........................ June 30, 2012 (the "Tranche A2 Original Maturity Date"); provided that if Tranche A2 is not fully repaid on the original maturity date, all interest accrued and payable will be capitalized and the outstanding principal balance (including capitalized interest) will accrue interest as described under "—Tranche A2 Pricing" below and will be payable on June 30, 2014.

*Tranche A1 Pricing* ................................. Tranche A1 will bear interest on the outstanding principal amount at an annual fixed rate equal to 9.25% (the "Tranche A1 Rate"). Interest will accrue beginning on the Value Date and will be capitalized on an annual basis; provided that Comerci may elect to pay interest in cash in respect of any interest period by delivering a notice to the administrative agent at least five (5) business days prior to the applicable interest payment date.

In the event Comerci's entire equity participation in Costco is sold prior to the maturity of Tranche A1 for net cash proceeds that are less than the outstanding principal amount of Tranche A1, including any capitalized interest (the difference, a "Tranche A1 Deficiency"), the A1 Rate with respect to such Tranche A1 Deficiency will immediately increase by 1.00% for the initial six-month period following such sale and increase by an additional 0.25% on a semi-annual basis thereafter for so long as such deficiency exists (such rate the "A1 Deficiency Rate"). Interest on such Tranche A1 Deficiency will be capitalized and added to the outstanding principal semi-annually in arrears and will accrue at the higher rate beginning on the date of the event giving rise to such Tranche A1 Deficiency; provided that Comerci may elect to pay interest in cash in respect of any interest period by delivering a notice to the administrative agent at least five (5) business days prior to the applicable interest payment date.

*Tranche A2 Pricing* ................................. Tranche A2 will bear interest quarterly on the outstanding principal amount equal to the implied rate of inflation for such quarter based on the

change in the value of the UDI during such quarter plus 75 basis points (the "<u>Tranche A2 Rate</u>"). Interest will be capitalized and added to the outstanding principal quarterly in arrears and will accrue beginning on the Value Date; <u>provided</u> that Comerci may elect to pay interest in cash in respect of any interest period by delivering a notice to the administrative agent at least five (5) business days prior to the applicable interest payment date.

In the event Tranche A2 is not fully repaid on the Tranche A2 Original Maturity Date, then following the Tranche A2 Original Maturity Date the remaining outstanding principal amount (including capitalized interest) of Tranche A2 (the "<u>Tranche A2 Deficiency</u>") will bear interest at an annual fixed rate equal to 9.25% (the "<u>A2 Deficiency Rate</u>"). Interest will be capitalized and added to the outstanding principal quarterly in arrears and will accrue at the higher rate beginning on the Tranche A2 Original Maturity Date; <u>provided</u> that Comerci may elect to pay interest in cash in respect of any interest period by delivering a notice to the administrative agent at least five (5) business days prior to the applicable interest payment date.

*Default Rate* ............................................. Upon the occurrence and during the continuance of an Event of Default (other than a payment Event of Default), amounts outstanding under the Asset-Linked Facility will bear interest payable in cash on demand at the following rates:

Tranche A1: Tranche A1 Rate <u>plus</u> 2.0%;

Tranche A1 Deficiency: A1 Deficiency Rate <u>plus</u> 2.0%;

Tranche A2: Tranche A2 Rate <u>plus</u> 2.0%; and

Tranche A2 Deficiency: A2 Deficiency Rate <u>plus</u> 2.0%.

Upon the occurrence and during the continuance of a payment Event of Default and upon acceleration as a result of any Event of Default, amounts outstanding under the Asset-Linked Facility will bear interest payable in cash on demand at the following rates:

Tranche A1: Tranche A1 Rate multiplied by 2;

Tranche A1 Deficiency: A1 Deficiency Rate multiplied by 2;

Tranche A2: Tranche A2 Rate multiplied by 2; and

Tranche A2 Deficiency: A2 Deficiency Rate multiplied by 2.

*Tranche A1 Collateral* ............................... Tranche A1 will be secured by a first-priority security interest, through a guaranty trust/*fideicomiso de garantía* and pledges/*prendas* (at Comerci's expense) as determined by the holders of Tranche A1 of the Asset-Linked Facility, in favor of the holders of Tranche A1 of the Asset-Linked Facility, in:

(i) the shares of Costco; <u>provided</u> that in the event Comerci decides to sell

its entire equity participation in Costco prior to the maturity of Tranche A1 and the net cash proceeds from such sale are less than the outstanding principal amount of Tranche A1, any such Tranche A1 Deficiency will be secured by a second priority security interest in favor of holders of Tranche A1 of the Asset-Linked Facility in the Sustainable Debt Collateral;

(ii) the Creditor Proceeds Account and any funds or securities therein, to the extent of the holders of Tranche A1 of the Asset-Linked Facility's portion (as applicable) of net cash proceeds received from the sale or disposition of property (including the Costco shares), equity issuances, casualty events and insurance and other mandatory prepayments; and

(iii) the holders of Tranche A1 of the Asset-Linked Facility's pro rata share of Comerci Proceeds Account and any funds or securities therein, to the extent held for reinvestment in connection with an asset sale or casualty event;

and, in the case of each of the foregoing, the proceeds of any of the foregoing (together, the "Tranche A1 Collateral").

Tranche A1 will also benefit from a second lien on the Sustainable Debt Collateral.

*Tranche A2 Collateral* .............................. Tranche A2 will be secured by a first-priority security interest in specific real estate assets, through a payment and guaranty trust or *fideicomiso de instrumento de pago y de garantia* and pledges/*prendas*, as the case may be (at Comerci's expense), as determined by holders of Tranche A2 of the Asset-Linked Facility in favor of the holders of Tranche A2 of the Asset-Linked Facility, in:

(i) certain specified real estate assets as disclosed to the Participating Claimants in an email dated March 23, 2010, with a book value of approximately MXP$1,804,843,186; provided, that if Comerci sells, prior to the Closing Date, additional Tranche A2 Collateral beyond the amount giving rise to the MXP$402,565,069 that will be paid on the Closing Date (the "Additional Tranche A2 Collateral Sales"), then the amount to be placed as Tranche A2 Collateral will be adjusted downwards by 1.48 times the amount of any additional cash received by the Tranche A2 creditors from the proceeds of Additional Tranche A2 Collateral Sales (Commercial Banks will agree with Comerci on a reasonable method to verify that the book value of the mortgaged real estate does not decrease from its commercial value by more than 10% or, otherwise, additional assets will have to be mortgaged; provided, however, that such additional real estate assets will have an individual value of less than MXP$50,000,000); provided further that in the event Comerci decides to sell the Tranche A2 Collateral prior to the maturity of Tranche A2 and the net cash proceeds from such sale are less than the outstanding principal amount of Tranche A2, any such Tranche A2 Deficiency will be secured by a second priority security interest in favor of the holders of the Tranche A2 of the Asset-Linked Facility in the Sustainable Debt Collateral;

(ii) the Creditor Proceeds Account and any funds or securities therein, to

the extent of the holders of Tranche A2 of the Asset-Linked Facility's portion (as applicable) of net cash proceeds received from the sale or disposition of property (including the Costco shares), equity issuances, casualty events and insurance and other mandatory prepayments; and

(iii) the holders of Tranche A2 of the Asset-Linked Facility's *pro rata* share of Comerci Proceeds Account and any funds or securities therein, to the extent held for reinvestment in connection with an asset sale or casualty event;

and, in the case of each of the foregoing, the proceeds of any of the foregoing (the "Tranche A2 Collateral", together with the Tranche A1 Collateral, the "Asset-Linked Collateral").

Tranche A2 will also benefit from a second lien on the Sustainable Debt Collateral.

*Guarantors* .............................................. Same as under the Secured Sustainable Debt Facility.

*Optional Prepayments* .............................. Same as under the Secured Sustainable Debt Facility.

*Mandatory Prepayment* ............................. *Sales of Asset-Linked Collateral.* Within five (5) business days of the receipt by Comerci or any of its subsidiaries of net cash proceeds from a sale of any Tranche A1 Collateral or Tranche A2 Collateral ("Asset-Linked Collateral Proceeds"), Comerci will apply such proceeds first to prepay any capitalized interest and second to prepay the outstanding principal amount (and accrued and unpaid interest), in each case of Tranche A1 or Tranche A2, respectively.

In the event that the Asset-Linked Collateral Proceeds exceed the outstanding amount under the applicable tranche of the Asset-Linked Facility, Comerci will apply the excess Asset-Linked Collateral Proceeds to prepay the outstanding amount under the other tranche of the Asset-Linked Facility.

In the event that the amount of Asset-Linked Collateral Proceeds exceeds the aggregate principal amount outstanding (and accrued and unpaid interest) of the Asset-Linked Facility, Comerci will apply no less than 60% of the excess Asset-Linked Collateral Proceeds to prepay the Secured Sustainable Debt Facility and the New Bonds in accordance with the Intercreditor and Collateral Agreement, and the remaining 40% of the Asset-Linked Collateral Proceeds will be cash entitled to Comerci and will be used for certain specifically enumerated purposes as set forth in "II. The Secured Sustainable Debt Facility—Use of Cash Entitled to Comerci" above.

*Sales of Property Other than Collateral.* Within five (5) business days of the receipt by Comerci or the Guarantors of net cash proceeds from any sale of other Property of Comerci or the Guarantors (other than the Sustainable Debt Collateral, Asset-Linked Facility Collateral and PSI Real Estate), 100% of such proceeds will be applied to prepay the Obligations in accordance with the terms of the Intercreditor and Collateral Agreement to the extent that such proceeds have not been reinvested within the time

period and up to the limit set forth in the definitive documentation.

The definition of an "asset sale" for purposes of the foregoing will contain customary carve-outs (other than with respect to the Sustainable Debt Collateral or the Asset-Linked Collateral) for transactions of this nature, including, but not limited to, carve-outs for dispositions of inventory, worn-out, obsolete or damaged property or equipment.

With respect to any asset sale, Comerci will, and will cause each of its subsidiaries to, receive consideration equal to or exceeding the then fair market value of the asset sold, and 100% of the consideration received from such asset sale will be in the form of cash or cash equivalents, subject to customary exceptions. The sale of the shares of Costco will be in exchange for consideration to be 100% in the form of cash or cash equivalents; provided that Comerci will be permitted to receive, in lieu of all or a portion of such cash or cash equivalent consideration, consideration in the form of readily marketable and liquid securities of Costco US that (i) are publicly listed and freely tradable and not subject to any legal, contractual or other restriction on transfer and (ii) immediately upon receipt, made subject to a first priority lien pursuant to a New York law governed stock pledge, in form and substance reasonably satisfactory to the collateral agent; and provided further that, to the extent that the consideration is in part cash and in part stock of Costco US, the cash portion of the consideration will be immediately applied to prepay the Obligations in accordance with the terms of the Intercreditor and Collateral Agreement.

The Asset-Linked Facility will also share ratably in (i) proceeds of sales / casualty events other than Collateral, (ii) non-reinvested PSI Net Cash Proceeds and (iii) non-pro rata prepayments of other Indebtedness.

*Other Terms*............................................. Same as under the Secured Sustainable Debt Facility.

**IV. The New Bonds**

**A. New Peso Bonds**

*Issuer* ......................................................... Comerci.

*Type of Security* ......................................... Mexican Peso Bond (the "New Peso Bonds").

*Currency* ..................................................... MXP$, payable in Mexican pesos or, at the request of any holder of the New Bonds, in Dollars at the prevailing Conversion Rate, to the extent Comerci is legally able to make such conversion.

*Indicative Amount* ..................................... MXP$1,951.43 million.[1]

Each of the Bondholders will be entitled to receive its *pro rata* share of the New Peso Bonds based on the Bondholders Financial Package.

*Maturity* ..................................................... June 30, 2018.

*Pricing* ....................................................... Interest will be payable in cash semi-annually in arrears. The New Peso Bonds will bear interest on the outstanding principal amount at an annual rate equal to 9.25% (the "Peso Fixed Rate").

*Default Interest Rate* .................................. Upon the occurrence and during the continuance of an Event of Default (other than a payment Event of Default), amounts outstanding under the New Peso Bonds will bear interest payable in cash on demand at the Peso Fixed Rate plus 2.0%.

Upon the occurrence and during the continuance of a payment Event of Default and upon acceleration as a result of any Event of Default, amounts outstanding under the New Peso Bonds will bear interest payable in cash on demand at the Peso Fixed Rate multiplied by 2.

**B. New US Dollar Bonds**

*Issuer* ......................................................... Comerci.

*Type of Security* ......................................... US Dollar Bond (the "New US Dollar Bonds").

*Currency* ..................................................... US Dollars ("US$").

*Indicative Amount* ..................................... US$223.9 million.[1]

Each of the Derivative Counterparties and the Bondholders will be entitled to receive its *pro rata* share of the above New US Dollar Bond based on the Financial Recovery Package for which it is eligible.

*Maturity* ..................................................... June 30, 2018.

---

1) Assumes 100% of the UDI bonds and 100% of the CCM Cebures holdouts (MXP$42,855,600) opt for financial package 3 as calculated on Schedule 1.

| | |
|---|---|
| *Pricing* ...................................................... | Interest will be payable in cash semi-annually in arrears in each year; the New US Dollar Bonds will bear interest on the outstanding principal amount at an annual rate equal to 7.0% (the "<u>US Dollar Fixed Rate</u>"). |
| *Default Interest Rate*.................................. | Upon the occurrence and during the continuance of an Event of Default (other than a payment Event of Default), amounts outstanding under the New US Dollar Bonds will bear interest payable in cash on demand at the US Dollar Fixed Rate <u>plus</u> 2.0%. |
| | Upon the occurrence and during the continuance of a payment Event of Default and upon acceleration as a result of any Event of Default, amounts outstanding under the New US Dollar Bonds will bear interest payable in cash on demand at the US Dollar Fixed Rate multiplied by 2. |

**C. Other Terms**

| | |
|---|---|
| *Collateral*.................................................... | The New Bonds will be secured by the Sustainable Debt Collateral on a *pari passu* basis. |
| *Guarantors* ................................................ | Same as under the Secured Sustainable Debt Facility. |
| *Representations and Warranties*............... | Same as under the Secured Sustainable Debt Facility. |
| *Issuer's Covenants*..................................... | Same as under the Secured Sustainable Debt Facility. |
| *Events of Default* ....................................... | Same as under the Secured Sustainable Debt Facility. |
| *Mandatory Prepayments*............................ | Same as under the Secured Sustainable Debt Facility; <u>provided</u>, <u>however</u>, that the Bondholders shall not be entitled to any prepayments from Excess Cash. |
| *Optional Prepayments* ............................... | As set forth in "II. The Secured Sustainable Debt Facility—*Optional Prepayments & Repurchases*". |

## V.  General Terms

*Lock-up/Restructuring Agreement* ............ As a condition to the Restructuring, and no later than July 15, 2010, Comerci will have received and entered into executed lock-up/restructuring agreements from Participating Claimants holding no less than 85% of Eligible Claims and Debt agreeing to support the terms of the Restructuring.  Such lock-up/restructuring agreements will contain customary terms, covenants, conditions and other provisions, including:

(i) agreement with the Derivative Counterparties regarding delivery of a settlement and debt acknowledgment concurrently with the execution of the Derivative Counterparty lock-up/restructuring agreements;

(ii) restrictions on the Participating Claimants' ability to transfer any Eligible Claims and Debt unless the transferee agrees to be bound by the terms of the lock-up/restructuring agreement and notice of such transfer is provided to Comerci;

(iii) a provision requiring the Participating Claimants to grant irrevocable powers of attorney to an agent reasonably satisfactory to Comerci, acting on behalf of the Participating Claimants authorizing such agent (subject to negotiation and execution of definitive documentation) to execute the Concurso Mercantil Plan and agree to extensions, as reasonably requested by Comerci, in accordance with the *Ley de Concursos Mercantiles*;

(iv) customary affirmative covenants by Comerci, including reasonable and confidential access to information, the implementation of the Restructuring, pending litigation, and conduct of business;

(v) payment by Comerci of an advisory / restructuring fee on the Closing Date in an amount equal to the interest payable on the relevant Financial Package from July 1, 2010  up to but not including the Closing Date as if the instruments had been issued on July 1, 2010;

(vi) a provision providing for the termination of the lock-up/restructuring agreement upon the occurrence of certain events (including failure to achieve certain specified milestones); and

(vii) a provision providing for the binding obligation during a one-year period (the "Extension Period") to consummate the Restructuring  on an out-of-court basis on the terms set forth in the Concurso Mercantil Plan, notwithstanding the occurrence of certain termination events under the lock-up agreement, in the event (A) the petition for the *concurso mercantil* proceeding is not accepted by a certain date or is rejected by the judge presiding over such proceeding, or (B) the occurrence of certain specified events which are not caused by a breach by Comerci, or (C) the judge presiding over the *concurso mercantil* proceeding does not approve a convenio concursal that conforms in all material respects to the Concurso Mercantil Plan or declares Comerci in bankruptcy (*quiebra*), provided that certain conditions are satisfied at the inception and for the duration of the Extension Period.

*Bondholders' Lock-up Fee, Expiry*                Those Bondholders that sign the lock up agreement will be entitled to a

| | |
|---|---|
| *Date and Acceptance Threshold*............ | 100 basis points fee payment on their Eligible Claims and Debt, payable no later than the date immediately prior to the filing of the *concurso*; <u>provided</u> that such Bondholder continues to be subject to the lockup agreement at the time of the filing of the *concurso*. |
| | The Bondholders lock-up/restructuring agreement will expire on July 15, 2010, if Comerci has not filed for *concurso* on or prior to such date. |
| *Payment on Closing Date* ......................... | Upon the Closing Date, Comerci will pay, in cash in the following amounts: |

- to the Derivative Counterparties, US$31,500,000 (which payment shall be the restructuring fee paid to the Derivative Counterparties;

- to the Commercial Banks, US$5,400,000 (which payment shall be the advisor's fee paid to the Commercial Banks);

- to the holders of U.S. dollar and Mexican Peso Bonds, US$7,900,000 (which payment shall be considered the restructuring fee paid to the Bonds);

- to the holders of UDI Bonds, US$140,000 (which payment shall be the restructuring fee paid to the UDI Bonds);

- to the holders of CCM outstanding Cebures Bonds, US$60,000 (which payment shall be the restructuring fee paid to the outstanding CCM Cebures Bonds);

- to the Tranche A2 creditors, MXP$402,565,069 to be applied immediately to the reduction in principal of Tranche A2, related to sales of assets that were to have been included as Tranche A2 Collateral, in the following amounts:

    o to the Derivative Counterparties MXP$310,020,173.8; and

    o to the Commercial Banks MXP$92,544,895.2

it being understood that (i) all amounts that are not paid on the Closing Date as described in this section will be subject to the applicable default rate pursuant to "II. The Secured Sustainable Debt Facility – Default Rate", "III. The Asset Linked Facility – Tranche A2 Default Rate" and "IV. The New Bonds – New Peso Bonds / New US Dollar Bonds Default Interest Rate"; and (ii) any unpaid amount at Closing that is subject to an applicable peso default interest rate shall be converted from U.S. dollars to Mexican pesos at the Closing Date exchange rate.

| | |
|---|---|
| *Intercompany Claims*............................... | Comerci will subordinate any future intercompany claims existing from time to time and will vote such claims, or implement a contractual arrangement to cause such claims to be voted, in any *concurso* with a majority of unaffiliated third-party creditors. |

| | |
|---|---|
| *Past Due Interest* ...................................... | Past due interest on any and all Eligible Claims and Debt held by Participating Claimants will be canceled against receipt by each Participating Claimant of a *pro rata* interest (taking into account all outstanding principal, including capitalized past due interest) in the Facilities as contemplated herein. |
| *Accrued Amounts in respect of Mandatory Prepayments* ..................... | Comerci will, on the Closing Date, pay any amounts in respect of events giving rise to Mandatory Prepayments occurring since the Value Date but not including the Closing Date, as if the Restructuring had occurred on the Value Date. |
| *Confidentiality; Announcements* .............. | Except as required by law and pursuant to the confidentiality agreement entered into between Comerci and Bondholders after as much advance notice to the other party(ies) as practicable and except for disclosures to affiliates, representatives and other identified parties who agree to keep such disclosures confidential or prospective transferees of claims or as part of a *concurso* process to implement the transactions contemplated hereby, no Participating Claimant will make any disclosure to any third party, or issue any reports, statements or releases to the public, of or regarding this Term Sheet, any terms hereof or the transactions contemplated hereby without the prior written consent of Comerci; <u>provided</u> that this provision will be in addition to, and will not limit or amend, any existing confidentiality obligations among the parties; <u>provided</u> <u>further</u> that Comerci will not disclose information regarding any agreement or understanding (including, without limitation, any settlement) with any Derivative Counterparty or Commercial Bank without such Derivative Counterparty's or Commercial Bank's consent, which consent will not be unreasonably witheld. |
| *Conditions Precedent* ............................... | The willingness of each Participating Claimant to participate in the Restructuring and enter into the Intercreditor and Collateral Agreement and a lock-up/restructuring agreement will be subject to: |
| | (i) prior to the filing of the *concurso*, (A) internal approval by each Participating Claimant, (B) a debt acknowledgement by Comerci of such Participating Claimant's Eligible Claims and Debt, to the extent that such Participating Claimant is a Derivative Counterparty; and (C) delivery by Comerci of evidence reasonably satisfactory to the Participating Claimants of the consent by Costco US to the filing of the Concurso Mercantil Plan and to the pledge of the shares of Costco; and |
| | (ii) after the filing of the *concurso*, (A) the entry into, and the satisfaction of customary conditions precedent to be included in, definitive documentation governing the lock-up/restructuring agreement and the Facilities, including receipt of customary legal opinions and the satisfactory granting and perfection of liens on all collateral contemplated on the Closing Date or, with respect to the perfection of mortgages (to the extent such mortgages cannot be perfected on the Closing Date as a legal matter), within a reasonable time thereafter and (B) the release and waiver of civil and criminal claims brought by all Participating Claimants and third parties controlled by such Participating Claimants against Comerci |

and any other creditor.

Comerci's willingness to enter into the Restructuring will be subject to the entry into, and the satisfaction of customary conditions precedent to be included in the definitive Restructuring documentation.

Comerci will have obtained all necessary board and shareholder approvals for all transactions relating to the Restructuring.

*Equal and Ratable Enhancement*.............. In the event that, at any time after the Closing Date, any other holder under any of the Facilities receives in exchange for waivers or amendments of any instrument of indebtedness in circumstances requiring an amendment or waiver from any holder of any of the Facilities, any (a) new or additional collateral, (b) new or additional guarantees or (c) fees, then, in any such case, all other holders under all other Facilities will be entitled to receive the same, on an equal and ratable basis, based on the greater of (x) then outstanding principal amounts or (y) such other measure upon which such fees are based, and Comerci agrees, and will cause each subsidiary to enter into such additional pledge or security agreements, guarantees or other collateral documentation as is necessary to effect such treatment.

*Agreements with Other Creditors*............. Except for the Cebures transaction as described in the Cebures exchange offer prospectus on file with the CNBV, Comerci will not enter into any agreement or transaction (including any payments) with any creditor that is not a Participating Claimant in its capacity as such holder or beneficial owner of Eligible Claims and Debt with respect to the restructuring of debt obligations of Comerci to such creditor on terms more favorable to it than the terms of the Restructuring are to the Participating Claimants.

*Assignment and Participations*................. The debt instruments received by the Participating Claimants will be freely assignable, subject to applicable law, rules and regulations.

*Required Lenders*...................................... Amendments and waivers will require the approval of Participating Claimants holding a percentage to be agreed in the Intercreditor and Collateral Agreement of aggregate amounts due under the Secured Sustainable Debt Facility, the New Bonds and the Asset-Linked Facility (with certain amendments and waivers to the terms applicable to a facility or tranche requiring the approval of Participating Claimants holding amounts due under such Facility or Tranche to be specified in the Intercreditor and Collateral Agreement), except that with respect to the release of any collateral, other than as permitted under the mergers, consolidations, acquisitions and asset sales covenant described in "II. The Secured Sustainable Debt Facility—Other Terms" above, the consent of Participating Claimants holding a greater percentage than as agreed for the circumstances set forth above of the aggregate amounts due under the applicable Facility will be required, and the consent of each Participating Claimant will be required for certain customary amendments including, but not limited to, reductions of principal, interest or fees payable to such Participating Claimant, and extensions of final maturity or scheduled amortization of the loans or commitments of such Participating Claimant.

| | |
|---|---|
| *Taxes* | The definitive documentation for the Restructuring will include customary provisions relating to taxes, including gross-up subject to a cap (such cap not to apply upon the occurrence and during the continuation of an Event of Default) equal to the rate applicable to foreign financial institutions. |
| *Fees and Expenses* | In connection with the Restructuring, Comerci will timely pay or reimburse all duly documented fees and expenses of (i) one financial advisor, one legal advisor in the U.S. and one legal advisor in Mexico as retained by the Derivative Counterparties, (ii) one legal advisor in the U.S. (for purpose only of reviewing the Intercreditor and Collateral Agreement) and one legal advisor in Mexico as retained by the Commercial Banks, and (iii) one financial advisor, one legal advisor in the U.S. and one legal advisor in Mexico as retained by the Bondholders collectively. |
| *Administrative Agent and Collateral Agent* | The parties will appoint an administrative agent for each of the Secured Sustainable Debt Facility, an administrative agent for each of the Asset Linked Facilities, a collateral agent for the Sustainable Debt Collateral and a collateral agent for the Asset-Linked Collateral, each of which will receive customary fees (to be paid by Comerci) and be retained on customary terms. |
| *Governing Law* | The indenture for the New Bonds will be governed by New York law. With respect to the Secured Sustainable Debt Facility and the Asset-Linked Facility, eligible Participating Claimants will have the option of entering into New York law governed agreements or Mexican law governed agreements for each facility. |
| *Submission to Jurisdiction* | Comerci will submit to jurisdiction in state and federal courts sitting in New York County, New York (in the case of agreements governed by New York law), or Mexico, D.F. (in the case of agreements governed by Mexican law). |

# Schedule 1

**Recovery Amount and Securities Allocation:** Each creditor will be entitled to receive a recovery amount based on the financial package entitled to its creditor class calculated as per the following formula based on the table below:

Each creditor class will be entitled to receive a recovery based on the following formula:

> Creditor Class Recovery = Claim amount as detailed on Table 1 below (excludes interest and fees) times the Multiplier times the percentage breakdown of each of the securities plus the cash payment, in each case entitled to its creditor class.

Each creditor will receive its pro rata share of its Creditor Class Recovery

| TABLE 1 | Financial Package 1<br>Derivatives | Financial Package 2<br>USD Bonds | Financial Package 3<br>Pesos Bonds + UDI<br>bonds + CCM Cebures | Financial Package 4<br>Commercial Banks |
|---|---|---|---|---|
| **Claim Amount** | | | | |
| Pesos | 8,729,847,671.5 | 3,000,000,000.0 | | 2,545,000,000.0 |
| USD (Peso Equivalent) | 20,645,357,312.4 | | 2,650,000,000.0 | 1,317,050,000.0 |
| UDI's | | | 24,981,400.0 | |
| UDI (Equivalent in Pesos as of 01/06/2010) | - | | 110,603,000.10 | - |
| CCM Cebures (not exchanged) | | - | 42,855,600.0 | |
| **Total (P$)** | **29,375,204,983.9** | **3,000,000,000.0** | **2,803,458,600.1** | **3,862,050,000.0** |
| **Total (US$)** | **2,216,996,602.6** | **226,415,094.3** | **211,581,781.1** | **291,475,471.7** |
| **Multiplier** | **45.4%** | **61.9%** | **61.9%** | **62.9%** |
| **Tranche % Allocation** | **% Breakdown** | **% Breakdown** | **% Breakdown** | **% Breakdown** |
| Tranche 1 | 33.91% | | | 30.29% |
| Tranche 2 | 20.49% | | | 27.90% |
| Peso Bonds | 0.00% | | 100.00% | |
| USD Bonds | 9.95% | 100.00% | | |
| AT1 | 26.29% | | | 26.65% |
| AT2 | 9.36% | | | 15.15% |
| **Total** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |
| Lock up Fee | | 100 bps | 100 bps | |
| USD Cash Payment at Closing (% of Claim Amount) | 1.42% | 1.85% | 1.85% | 1.86% |
| **Total % Recovery (excludes Bond lock up fee)** | **46.79%** | **63.74%** | **63.74%** | **64.74%** |

(a) Lock up fee increases USD Bonds, Peso Bonds, UDI Bond and CCM Cebures recovery to 64.74%.

(b) Assumes 100% of the UDI Bonds and Cebures choose FP3, however, they will have the flexibilty to choose between FP2 or FP3

## SCHEDULE 2

### Derivative Counterparties

| Creditor | MXP | USD |
|---|---|---|
| Banco Nacional de México, S.A. | 6,900,635,070.50 | |
| Citibank, N.A. | | 3,850,000.00 |
| JPMorgan Chase Bank, N.A. | | 477,590,253.00 |
| Merrill Lynch Capital Markets A.G. / Merrill Lynch Capital Services Inc. | | 447,125,482.15 |
| J. Aron & Company | | 344,270,423.52 |
| Barclays Bank PLC | | 285,304,014.56 |
| Banco Santander (México), S.A. | 1,766,594,131.93 | |

Note: The above amounts represent the principal claims net of collateral of each derivative counterparty before interest.

**Commercial Banks**

| Commercial Bank | MXP | USD |
|---|---|---|
| BBVA Bancomer, S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer | 900,000,000.00 | 52,000,000.00 |
| Scotiabank Inverlat, S.A., Institución de Banca Múltiple, Grupo Financiero Scotiabank Inverlat | 250,000,000.00 | |
| Banco Mercantil del Norte, S.A., Institución de Banca Múltiple, Grupo Financiero Banorte | 1,000,000,000.00 | |
| Ixe Soluciones, S.A. de C.V., Sociedad Financiera de Objeto Múltiple, Entidad Regulada, Ixe Grupo Financiero | 100,000,000.00 | |
| HSBC Mexico, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC | 295,000,000.00 | |
| Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander | | 17,400,000.00 |
| JP Morgan Chase Bank, N.A. | | 30,000,000.00 |

Note: The above amounts represent the principal claims of each commercial bank before interest.

**The Bonds**

US$200,000,000 principal amount of 6.625% Senior Notes due 2015

MXP$110,603,000 UDI-denominated Senior Notes due 2010 (UDI value as of 01/06/2010)

MXP$3,000,000,000 principal amount of 8.7% Senior Notes due 2027

Note: The above amounts represent the principal claims of each series of bonds before interest. The UDI amount is indicative as it changes according to the UDI value.