Gary L. Kaplan
Peter B. Siroka
FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
One New York Plaza
New York, New York  10004
Telephone: (212) 859-8000
Facsimile:  (212) 859-4000

*Attorneys for Fernando del Castillo Elorza as*
*Foreign Representative of Controladora*
*Comercial Mexicana, S.A.B. de C.V.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| **CONTROLADORA COMERCIAL** | ) | Case No. 10-13750 (SMB) |
| **MEXICANA, S.A.B. de C.V.** | ) | |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |
| **CONTROLADORA COMERCIAL** | ) | |
| **MEXICANA, S.A.B. DE C.V.** | ) | Adv. Proc. No. 10-_____ (___) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DOES 1-1000** | ) | |
| | ) | |
| Defendants. | ) | |

**VERIFIED COMPLAINT FOR TEMPORARY**
**RESTRAINING ORDER AND INJUNCTIVE RELIEF**

      Fernando del Castillo Elorza (the "Petitioner"), as the authorized foreign representative

of Controladora Comercial Mexicana, S.A.B. de C.V. ("CCM"), a debtor in a voluntary

insolvency proceeding currently pending in Mexico (the "Concurso Proceeding"), by and

through its undersigned counsel, Fried, Frank, Harris, Shriver & Jacobson LLP hereby brings

this action for a temporary restraining order and injunctive relief, and for its Complaint alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.     This action for a temporary restraining order ("TRO") and injunctive relief is brought pursuant to sections 105 and 1519 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), Rule 65 of the Federal Rules of Civil Procedure as incorporated by Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Bankruptcy Rule 7001.

2.     CCM respectfully requests that the Court enter an order (the "Order") enjoining all persons (including individuals, partnerships and corporations, and all those acting for or on their behalf), and all governmental units (including the United States of America and any State, Commonwealth, District, Territory, municipality, a foreign state, or other foreign or domestic governments, and all those acting for or on their behalf) from taking the following actions in the United States and its territories against CCM:

  (a)     Commencing or continuing any suit, action, enforcement process, extrajudicial proceeding or other proceeding (including any proceeding in a court, statutory or otherwise) (collectively, a "Proceeding"), or claim against CCM and/or its assets wherever located in the United States or its territories;[1] and

  (b)     Any action that would be in violation of any other order of this Court.

3.     CCM further requests that the Order be initially entered as a temporary restraining order and that a status conference be set prior to the expiration of the initial ten (10) day term of the TRO.  Thereafter, CCM requests that the Court either extend the Order for an additional ten (10) day period or enter the Order as a preliminary injunction pending the Court's determination concerning the recognition of the Concurso Proceeding as a foreign main proceeding.

---

[1]     As such, CCM also requests that any and all Proceedings currently pending against CCM be hereby stayed and suspended.

4.     CCM further requests that the Order provide that upon the occurrence of a Trigger Event (defined below) with respect to a Standstill Agreement (defined below) between CCM and a DCP Plaintiff (defined below), the injunction and stays set forth in paragraph 2 above shall automatically be lifted without the need for further order or action of the Court to allow such DCP Plaintiff to: (i) send a notice terminating its Standstill Agreement with CCM (to the extent such notice is required pursuant to the terms of the relevant Standstill Agreement) and (ii) exercise all of its rights and remedies (including, without limitation, continuance of the Derivatives Litigation (defined below)) against CCM and its assets, free of any stay or injunction ordered by this Court.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P) as a matter under chapter 15 of the Bankruptcy Code.

6.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1409(a) and 1410(2).

## THE PARTIES

7.     CCM is the holding company for a series of Mexican businesses which comprise the third largest operator of food retail stores in Mexico.  CCM is a corporation (sociedad anónima bursatil de capital variable) under the laws of Mexico and maintains its principal place of business in the Federal District of Mexico.

8.     Upon information and belief, Defendants Does 1 through 1000 (the "Noteholders") are holders of the 2015 Notes, the 2027 Notes and the 2010 Notes (each as defined below) and other creditors of CCM (together with the Noteholders, the "Defendants").

# FACTS

A.   **CCM's Business**

     9.     Originally founded in 1944, CCM is the holding company for a series of Mexican businesses that comprise the third largest operator of food retail stores in Mexico.  As of December 31, 2009, CCM's businesses operated 231 retail stores and 73 restaurants under eight different formats—six different retail store formats, one warehouse club and one chain of family restaurants—in twenty-four Mexican states.  CCM's retail brands include Comercial Mexicana, Bodega Comercial Mexicana, Mega, City Market, Sumesa, Fresko and Al Precio.  CCM also owns the Restaurantes California chain of family-style restaurants and participates in a joint-venture with Costco Wholesale Corporation to operate warehouse clubs under the Costco brand.  For the fourth quarter of 2009, CCM reported net sales of approximately MXP 14.441 billion (approximately US$1.139 billion) and employed approximately 33,000 people.[2]

B.   **CCM's Indebtedness and the Circumstances Precipitating the Concurso Proceeding**

    i.    *CCM's Current Indebtedness*

     10.     CCM's principal indebtedness consists of (i) unsecured notes, (ii) Mexican commercial paper (the "Cebures") and (iii) unsecured bank loans (the "Bank Debt").  There are three series of unsecured notes: (a) US$200 million in principal of 6.625% Senior Notes due 2015 (the "2015 Notes"); (b) MXP 3 billion in principal of 8.7% Senior Notes due 2027 (the "2027 Notes"), and (c) MXP 111,341,051 in principal of UDI-denominated 8% Senior Notes due 2010[3] (the "2010 Notes" together with the 2015 Notes and 2027 Notes, the "Notes").  The Notes are held by Cede & Co. and are beneficially owned by many different parties, and as such, not all

---

[2]    As a holding company, CCM has no employees of its own.  All employees are employees of CCM's subsidiaries and affiliates.

[3]    The MXP value of the 2010 Notes is based on the UDI conversion rate as of April 28, 2010.  The 2010 Notes are 24,981,400 UDI in principal.

Noteholders are known to CCM.  The Bank of New York Mellon acts as indenture trustee for the 2015 and 2027 Notes, while HSBC acts indenture trustee for the 2010 Notes (together, the "Indenture Trustees").  The Cebures consist of MXP 1.5 billion of commercial paper, 97.3% of which is held by a subsidiary of CCM, Tiendas Comercial Mexicana ("Tiendas"), which acquired the Cebures in an exchange offer on May 4, 2010.  The remaining Cebures are held by a number of different owners who did not participate in the exchange offer.  The Bank Debt consists of MXP and USD denominated unsecured loans to seven different Mexican banks (the "Commercial Banks") totaling MXP 2.545 billion and US$99.4 million.[4]  CCM has also entered into a Settlement and Debt Acknowledgement Agreement (as defined below) to settle CCM's obligations under certain foreign exchange and interest rate Derivative Transactions (as defined below), as more fully described below.

ii.  *The Derivative Transactions*

11.  CCM began engaging in hedging activities in the 1990s, to control currency risk on U.S. imports and debt service.  From time to time, CCM also entered into interest rate swaps to convert long term fixed rate payments into cheaper floating rate payments, to save on debt service costs.

12.  In 2005, CCM entered into a substantial program of forward dollar purchases to hedge against the potential decline in value of the Mexican peso (the "Peso Hedges").  When the Mexican peso did not decline, CCM began to lose money on the Peso Hedges.  Subsequently, CCM entered into various derivative transactions to offset the losses from the Peso Hedges.  Many of these transactions involved CCM taking positions in the U.S. dollar and other foreign currencies.

---

[4]  A list of the Commercial Banks and their respective holdings of the Bank Debt is included on Schedule 3 to the Term Sheet (defined below).

13.     During 2007 and 2008, CCM entered into derivative transactions (the "Derivative Transactions") with JP Morgan Chase Bank, N.A., Banco Nacional de Mexico, SA Institution de Banca Multiple, Grupo Financiero Banamex, Banco Santander, S.A, Grupo Financiero Santander, Barclays Bank PLC, J. Aron & Company,[5] Merrill Lynch Capital Services Inc. and Merrill Lynch Capital Markets AG (together, the "Derivative Counterparties").

14.     In late September and early October 2008, following turmoil in the financial markets and the Lehman Brothers bankruptcy filing, there was a significant devaluation of the Mexican peso and the Euro against the U.S. dollar.  As a result of this devaluation, CCM found itself facing substantial claims for margin calls arising on account of the Derivative Transactions.  In early October, the Derivative Counterparties exercised contractual provisions to terminate the transactions, and asserted claims exceeding US $2 billion against CCM for the amounts they claim are due upon such early termination.

15.     Because of the mounting loss claims and additional margin calls associated with the Derivative Transactions, CCM faced a severe liquidity crisis and became unable to pay its suppliers and providers.  All payments to suppliers and providers temporarily ceased on October 7, 2008, the same day that CCM made its final margin call payment to the Derivative Counterparties.  On October 9, 2008, CCM filed a voluntary petition (the "First Concurso Petition") to commence a case under Mexico's *Ley de Concursos Mercantiles* (the "Concurso Law") with the District Court for Civil Matters for the Federal District, Mexico (the "Federal District Court"), which was subsequently rejected on October 27, 2008.  On October 29, 2008, CCM filed a second petition for relief under the Concurso Law with the Federal District Court (the "Second Concurso Petition").  The Second Concurso Petition was rejected on November 3,

---

[5]     On October 20, 2008, J. Aron & Company was assigned the claims in the Derivative Transactions.  For ease of reference, both J. Aron & Company and J. Aron & Company's assignor are referred to herein as "J. Aron & Company."

2008. Both the First Concurso Petition and the Second Concurso Petition were denied on technical grounds under Mexican law.

     iii.     *Current Litigation*

     16.     On November 6, 2008, certain of the Derivative Counterparties (the "DCP Plaintiffs")[6] filed complaints against CCM in the New York State Supreme Court for New York County (the "New York Court"), which are currently pending before Justice Eileen Bransten (the "Derivatives Litigation").[7] Generally, the complaints allege that CCM breached the underlying agreements governing the Derivative Transactions by failing to post required collateral or make payments allegedly owed to the DCP Plaintiffs. The DCP Plaintiffs are seeking combined damages of over USD $1.5 billion. Each of the DCP Plaintiffs moved for summary judgment in the Derivatives Litigation (such motions, the "Summary Judgment Motions"). On March 16, 2010, the New York Court issued its decisions granting the Summary Judgment Motions as to liability only, and referring the quantification of losses to a special referee to hear and report. CCM has appealed those decisions. At a conference held on May 12, 2010, the New York Court invited CCM to file motions setting forth its grounds for seeking pretrial discovery on loss calculations. Such motions are scheduled to be filed on July 21, 2010, and to be argued, after briefing, on October 28, 2010.

     iv.     *Current Restructuring*

     17.     Following the rejection of the Second Concurso Petition and shortly after the commencement of litigation by the DCP Plaintiffs, CCM commenced the process of negotiating

---

[6]     The DCP Plaintiffs are JP Morgan Chase Bank, N.A., Barclays Bank PLC, J. Aron & Company, Merrill Lynch Capital Services Inc. and Merrill Lynch Capital Markets AG.

[7]     The case names and their index numbers are: <u>J.P. Morgan Chase Bank, N.A. v. CCM</u>, Index Number 603215/2008; <u>J. Aron & Company v. CCM</u>, Index No. 603225/2008; <u>Merrill Lynch Capital Markets AG and Merrill Lynch Capital Services Inc. v. CCM</u>, Index No. 603214/2008; and <u>Barclays Bank PLC v. CCM</u>, Index No. 603233/2008.

a global settlement of its outstanding indebtedness with its various creditor constituencies. After more than a year of negotiations, in late May 2010, CCM agreed with the Derivative Counterparties, the Commercial Banks and certain Noteholders on the terms of a restructuring to be consummated through a prenegotiated plan of reorganization under the Concurso Law that is supported by over 85% of the eligible debt and claims of CCM (as further described in the Term Sheet (defined below), the "Eligible Debt").

C.     **The Concurso Plan**

18.     On July 14, 2010, CCM commenced the Concurso Proceeding by filing a voluntary petition for relief under the Concurso Law (the "Concurso Petition") in the Federal District Court, along with a prenegotiated concurso plan of reorganization (the "Concurso Plan"). As of the date hereof, the Concurso Plan is supported by a sufficient majority so as to bind non-consenting parties under Mexican Law. Concurrently with the filing of the Concurso Plan, CCM filed a verified petition for recognition of the Concurso Proceeding as a foreign main proceeding (the "Verified Petition").

19.     The Concurso Plan, as more fully described in the term sheet setting forth the terms of the Concurso Plan, which is attached hereto as **"Exhibit 1"** (the "Term Sheet") (defined below), in exchange for extinguishment of their existing claims, (i) the Derivative Counterparties will receive their pro rata share of a package consisting of (a) a new term loan facility (the "New Term Loan"), (b) a new asset-linked debt facility (the "Asset-Linked Facility"), and (c) new secured bonds (the "New Bonds"); (ii) the Commercial Banks will receive their pro rata share of a package consisting of portions of the New Term Loan and Asset-Linked Facility; and (iii) the Noteholders will receive a portion of the New Bonds.

20.     The New Term Loan consists of two tranches: an MXP 5.25477 billion amortizing tranche and an MXP 3.40773 billion bullet tranche. The New Term Loan is secured

by, among other things (a) first-priority liens on (i) all of CCM's real property assets with a value in excess of MXP 50 million (with certain specific exceptions), (ii) all of the capital stock owned by CCM, directly or indirectly, in each of the Guarantors[8] (other than capital stock currently serving as collateral for the Scheduled Working Capital Debt Facilities (to be defined in the definitive documentation) and Credit Support Facilities (to be defined in the definitive documentation)), (iii) all collateral previously pledged for the Scheduled Working Capital Debt Facilities and Credit Support Facilities that ceases to secure such facilities (each as defined in the Term Sheet), and (iv) a Creditor Proceeds Account (as defined in the Term Sheet); and (b) the Comerci Proceeds Account (as defined in the Term Sheet) and any funds or securities therein, to the extent held for reinvestment in connection with an asset sale or casualty event. The Asset-Linked Facility will consist of two tranches of (i) MXP 4.15074 billion and (ii) MXP$1.61593 million minus the amount of any cash proceeds paid by CCM to the Tranche A2 (as defined in the Term Sheet) creditors on the Closing Date[9] from Additional Tranche A2 Collateral Sales (as defined in the Term Sheet) made before the Closing Date, respectively. The two tranches of the Asset-Linked Facility are secured by separate pools of collateral, and proceeds from the sale of such collateral will be used to pay down the balance of the respective tranche, and if the proceeds exceed the remaining balance of such tranche the excess must be used to pay the other tranche (60% of any excess remaining after payment of the other tranche of the Asset-Linked Facility will be used to prepay the New Term Loan and the New Bonds, and the remaining 40% of such excess may be used by CCM for certain enumerated purposes set forth in the Term Sheet). The

---

[8] Guarantors are defined in the Term Sheet to include "all existing direct and indirect subsidiaries of Comerci and all future direct or indirect subsidiaries of [CCM], except for (i) Costco and its Subsidiaries and (ii) each existing and future permitted joint venture, so long as [CCM's] ownership of such joint venture is 50% or less and [CCM] does not otherwise control such joint venture."

[9] The "Closing Date" is the date that is three (3) days following the date on which there is a final and non-appealable judgment issued by the Mexican court with respect to the Concurso Plan.

New Bonds will consist of a series of Mexican bonds and U.S. Dollar bonds in the amount of MXP 1.95143 billion and US$223.9 million, respectively. The New Bonds will be secured by the same collateral package as the New Term Loan.

D.    **The Settlement with the Derivative Counterparties to Effect the Concurso Plan**

21.    Prior to the filing of the Concurso Proceeding, in order to facilitate the restructuring described above, CCM entered into standstill agreements with creditors holding an aggregate of approximately 85% of the Eligible Debt (each a "Standstill Agreement" and, collectively, the "Standstill Agreements").[10] As material inducement for the Derivative Counterparties to enter into such Standstill Agreements, CCM and each Derivative Counterparties also entered into agreements which acknowledge such Derivative Counterparty's claim and settle such claim for the consideration described above and more fully in the Term Sheet (each a "Settlement and Debt Acknowledgement Agreement"). The form of Derivative Counterparty Standstill Agreement, with the form of Settlement and Debt Acknowledgement Agreement attached as an annex, executed by the Derivative Counterparties and CCM is attached hereto as **Exhibit 2**. The Standstill Agreements provide that under certain terms and conditions set forth therein, holders of Eligible Debt and CCM will agree to support and facilitate the restructuring on the terms and conditions set forth in the Term Sheet and the Concurso Plan. The Standstill Agreements further provide that pending the consummation of the restructuring embodied in the Term Sheet and the Concurso Plan, each Creditor (as defined in each Standstill Agreement) that enters into a Standstill Agreement will forbear from exercising its rights and remedies in respect in respect of certain debt and certain pending claims.

---

[10]    Any discussion herein of the Standstill Agreements is qualified in its entirety by the actual terms and conditions of the Standstill Agreements. In the event of any inconsistency between the summary contained of the Standstill Agreements contained herein and the actual terms of the Standstill Agreements, the actual terms of the Standstill Agreements shall control in all respects.

22.     Concurrently with entry into the Standstill Agreements, CCM and its subsidiaries entered into agreements with those creditors that executed Standstill Agreements, which obligate CCM and its subsidiaries, on the one hand, and those creditors executing Standstill Agreements, on the other hand, to use their reasonable best efforts, for a period not to exceed one year following the occurrence of a Release Event (as defined in the Standstill Agreements), to consummate a restructuring of CCM and/or its subsidiaries on an out-of-court basis on the same commercial and other terms as set forth in the Term Sheet and the Concurso Plan (each such agreement, a "Subsidiary Agreement" and, collectively, the "Subsidiary Agreements").[11]  A copy of a Subsidiary Agreement is attached hereto as **Exhibit 3**.

23.     The Standstill Agreements each provide that upon any termination pursuant to its terms that is not caused by a breach of such Standstill Agreement by CCM (or its principal operating subsidiary, Tiendas Comercial Mexicana, S.A. de C.V. ("TCM")) (any termination of a Standstill Agreement, a "Standstill Termination Event"),[12] CCM and such Creditor will have the

---

[11]     Any discussion herein of the Subsidiary Agreements is qualified in its entirety by the actual terms and conditions of the Subsidiary Agreements.  In the event of any inconsistency between the summary contained of the Subsidiary Agreements contained herein and the actual terms of the Subsidiary Agreements, the actual terms of the Subsidiary Agreements shall control in all respects.

[12]     Each Standstill Agreement provides for termination of the Standstill Agreement upon a variety of events, subject to any remaining obligations as set forth therein and any rights of cure as set forth therein.  For example, in the Standstill Agreements applicable to each Derivative Counterparty, such events include, among others: (i) termination of the Standstill Agreement by the relevant Derivative Counterparty upon notice to CCM if: (a) CCM breaches its obligations under the Standstill Agreement, the Subsidiary Agreement or Stipulation with the applicable Derivative Counterparty (subject to any applicable cure rights) or (b) CCM breaches any representations or warranties contained in the Standstill Agreement (*see* Ex.2 to Verified Petition, § 12(a)), (ii) termination by CCM or the Derivative Counterparty if the Federal District Court rejects the Concurso Plan, provided that each of the Derivative Counterparty and CCM shall be bound by Section 7 of the Standstill Agreement (Binding Obligation to Consummate the Restructuring) but only to the extent that such termination was not caused by a breach of the obligations herein by the other Party (or in the case of the Derivative Counterparty, TCM) and only so long as the conditions referred to in Section 7 are being satisfied (*see id.*, § 12(c)), (iii) an automatic termination upon the earlier of: (a) the consummation of the Restructuring (as defined in the Standstill Agreement attached to the Verified Petition) or (b) the first anniversary of the Effective Date (as defined in the Standstill Agreement attached to the Verified Petition); provided that such termination shall not affect the obligations, if any, of the parties pursuant to Section 7 (Binding Obligation to Consummate the Restructuring), to the extent applicable (*see id.*, § 12(d)).

obligations set forth in the relevant Subsidiary Agreement. Upon the occurrence of a Standstill Termination Event and the expiration or earlier termination of such Creditor's Subsidiary Agreement (any such occurrence, a "Trigger Event"), the forbearances contained in the Creditor's Standstill Agreement with CCM will terminate. CCM and the DCP Plaintiffs have agreed that upon the occurrence of a Trigger Event with respect to a DCP Plaintiff, any stays or injunctive relief in effect in this Chapter 15 case will automatically be lifted without the need for further order or action of the Court to allow the relevant DCP Plaintiff to: (i) send a notice terminating its Standstill Agreement with CCM, to the extent such a notice is required under the relevant Standstill Agreement, and (ii) exercise all of its rights and remedies (including, without limitation, continuance of the Derivatives Litigation) against CCM and its assets, free of any stay or injunction ordered by this Court.

24.     Prior to the filing of the Concurso Proceeding with the Federal District Court, CCM entered into a stipulation with each of the DCP Plaintiffs, which was so ordered by the New York Court (each a "Stipulation") staying the Derivatives Litigation pending completion of the global settlement contained in the Term Sheet and the Concurso Plan. A copy of a Stipulation is attached hereto as **Exhibit 4**. Each Stipulation provides that upon the occurrence of a Trigger Event, the Stipulation will terminate, such that a DCP Plaintiff may elect to continue the Derivatives Litigation and/or exercise any of its rights and remedies against CCM or its assets.

## FIRST CAUSE OF ACTION
### *(Temporary Restraining Order)*

25.     CCM hereby repeats and realleges every allegation set forth in the preceding paragraphs as though fully set forth herein.

26. The Notes are governed by New York law and provide that litigation regarding the Notes must be brought in New York courts.

27. Notice of the Concurso Proceeding was announced publicly in a press release issued by CCM. In addition, copies of complaint and the Verified Petition have been served on (i) the Indenture Trustees (for distribution to the Noteholders); (ii) counsel to the Derivative Counterparties; (iii) counsel to the Ad Hoc Group of Noteholders; (iv) counsel to the Commercial Banks; and (v) all other known U.S. and foreign creditors of CCM.

28. Because they have received advance or contemporaneous notice of the Concurso Proceeding, creditors, including Noteholders who have not been party to negotiations to date, will be in a position to commence litigation in New York against CCM almost immediately after the Verified Petition is filed.

29. Any litigation would necessarily distract CCM from its task of reorganizing and implementing the Concurso Plan. Moreover, any delay or disruption of the implementation of the Concurso Plan will cause CCM irreparable harm. Among other things, it will likely unravel the transactions contemplated therein, significantly increasing CCM's liabilities and forcing CCM, if at all possible, to restructure on significantly worse terms than as currently contemplated.

30. The registered holder of the Notes is the Depository Trust Company (through Cede & Co.), and the notes are beneficially held by many different parties, not all of whom are known to CCM. Accordingly, the Indenture Trustees have received notice of the Concurso Proceeding and/or the Verified Petition for distribution to all Noteholders through the Depository Trust Company system, and no further notice is required.

31.     A TRO should be imposed to protect CCM from the distraction and impediment of burdensome litigation commenced by Noteholders or other parties in the United States.

## SECOND CAUSE OF ACTION
### *(Preliminary Injunction)*

32.     CCM has already filed and received the requisite creditor approval for the Concurso Plan, which will likely be approved by the Federal District Court in the near term.

33.     The actions sought to be enjoined would impose a significant burden on CCM and delay and impede CCM's restructuring efforts.  Moreover, any delay or disruption of the implementation of the Concurso Plan will cause CCM irreparable harm.  Among other things, it will likely unravel the transactions contemplated therein, significantly increasing CCM's liabilities and forcing CCM, if at all possible, to restructure on significantly worse terms than as currently contemplated.

34.     The balance of the harms weighs in favor of granting the injunctive relief.  Parties enjoined from commencing litigation in the United States would not lose any rights in the Concurso Proceeding or forfeit any recoveries coming to them under the Concurso Plan, while commencing litigation will distract CCM from its reorganization efforts and delay recoveries, eroding value to creditors as the automatic stay under section 362 of the Bankruptcy Code will apply once this Court recognizes the Concurso Proceeding as a foreign main proceeding.

35.     The TRO and preliminary injunction are necessary only for the relatively short period between the filing of the Chapter 15 Petition and the Federal District Court's acceptance of the Concurso Proceeding.

36.     The public interest weighs in favor of granting the TRO and preliminary injunction.  If the Concurso Plan is not consummated CCM would be forced to liquidate, costing thousands of jobs and depriving its creditors of significant value.

37.     A preliminary injunction is warranted to protect CCM from harmful litigation.

WHEREFORE, CCM requests that (i) the Court immediately enter the Order as a TRO, with a status conference to be set prior to the expiration of the initial 10 day term; (ii) thereafter, the Court enter the Order as a preliminary injunction pending the Court's decision concerning recognition of the Concurso Proceeding as a foreign main proceeding; and (iii) the Court provide any additional relief that it feels to be just and proper.

Dated: July 16, 2010
New York, New York

Respectfully submitted,

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP

/s/ Gary L. Kaplan
Gary L. Kaplan
Peter B. Siroka
One New York Plaza
New York, New York  10004
Telephone:     (212) 859-8000
Facsimile:      (212) 859-4000

*Attorneys for Fernando del Castillo Elorza*
*as Foreign Representative of Controladora*
*Comercial Mexicana, S.A.B. de C.V.*

## <u>VERIFICATION</u>

I, Fernando del Castillo Elorza, solely in my capacity as the authorized representative of

CCM, hereby verify under penalty of perjury under the laws of the United States that the

Verified Complaint and the statements contained therein are, to the best of my knowledge, true

and correct.

Dated:   Mexico D.F., Mexico
           July 16, 2010

/s/ Fernando del Castillo Elorza
Fernando del Castillo Elorza